## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| TONJA B. CARTER, in her capacity<br>as Personal Representative of the<br>ESTATE OF NELLE HARPER LEE,<br><br>          Plaintiff,<br><br>v.<br><br>RUDINPLAY, INC., a New York<br>Corporation,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.  18-cv-117 |

## **COMPLAINT**

Plaintiff Tonja B. Carter, in her capacity as Personal Representative of the Estate of Nelle Harper Lee, makes the following complaint for a declaratory judgment pursuant to 28 U.S.C. § 2201 against Defendant Rudinplay, Inc.:

### The Parties

1.     Plaintiff Tonja B. Carter ("Ms. Carter") brings this action in her capacity as the Personal Representative of the Estate of Nelle Harper Lee.  Ms. Carter is a citizen of Monroe County, Alabama.

1

2.     Nelle Harper Lee ("Ms. Lee") was a citizen of Monroe County, Alabama at all times relevant to this action, up to and including her death on February 19, 2016.  She was the author of the novel *To Kill a Mockingbird*.

3.     Defendant Rudinplay, Inc. ("Rudinplay") is a New York corporation with its principal place of business in the State of New York.  Rudinplay is a theater production company whose principal is producer Scott Rudin ("Mr. Rudin").

## Jurisdiction and Venue

4.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

5.     This Court has personal jurisdiction over Rudinplay because the claim asserted in this Complaint arises out of and relates to Rudinplay's contacts with the State of Alabama, and Rudinplay purposefully availed itself of the privilege of conducting activities within the State of Alabama.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district and a substantial part of the property that is the subject of this action is situated in this district.

## Facts

7.    *To Kill a Mockingbird* is a Pulitzer Prize winning novel that has sold more than 40 million copies and been translated into more than 40 languages since it was published in 1960.  About 1 million copies of the novel are sold each year. The novel was made into an Oscar-winning movie starring Gregory Peck with a screenplay by Horton Foote in 1962.  The novel was also adapted as a play by Christopher Sergel.  The novel was a valuable asset of Ms. Lee during her lifetime and is now a valuable asset of her estate.

8.    Atticus Finch, the central figure in *To Kill a Mockingbird*, is an iconic character in American literature.  Based on Ms. Lee's own father, a small-town Alabama lawyer who represented black defendants in a criminal trial, Atticus Finch is portrayed in the novel as a model of wisdom, integrity, and professionalism.  He took on a representation that was unpopular in his community, stood up for his client in the face of a lynch mob, and provided zealous advocacy at trial—knowing that a jury in fictional Maycomb, Alabama in the 1930s likely would convict a poor black man accused of raping a white woman.  Not just a courageous lawyer, Atticus Finch was also a wise and compassionate father.  In 2002, *Book* magazine named Atticus Finch the 7th best character in fiction since 1900.[1]  In 2003, Atticus Finch was the

---

[1]    *See* https://www.infoplease.com/arts-entertainment/literature-and-books/100-best-characters-fiction-1900 (visited Mar. 12, 2018) (ranking by a panel of 55 authors, literary agents, editors, and actors).

Number 1 Hero on the American Film Institute's 100 Greatest Heroes & Villains list.[2] The Alabama State Bar even placed a monument to Atticus Finch, the "lawyer-hero," in Monroeville, Alabama in 1997.

### The Contract

9.      Ms. Lee entered into a contract with Rudinplay as of June 29, 2015, in connection with the live stage and ancillary rights in and to the novel titled *To Kill a Mockingbird* (the "Contract"). A copy of the Contract is attached as Exhibit A.

10.     "Novel" is defined in the Contract to be the novel *To Kill a Mockingbird*.

11.     "Play" as used in the Contract means a live stage play based on and using the Novel and any and all elements thereof.

12.     "Author" as used in the Contract means Ms. Lee.

13.     In the Contract, Rudinplay agreed to pay $100,000.00 to obtain an exclusive agency from Ms. Lee to procure a playwright to create a dramatic adaption of her Novel and to acquire the sole and exclusive option to acquire exclusive worldwide live stage rights in and to the Novel (with a specified limitation). For her part, Ms. Lee agreed that during the period when Rudinplay held live stage rights, she would not authorize the development, marketing, and/or production of any live

---

[2]      *See* www.afi.com/Docs/100Years/handv100.pdf (visited Mar. 12, 2018).

stage production or other live show or audiovisual production that is based on the Novel or any portion thereof.

14.     Rudinplay expressly agreed that there would be an annual professional performance of the Play in Monroeville, Alabama and a restriction against any license for performances of the Play within 60 miles of Monroeville, Alabama.

15.     Rudinplay further agreed that Ms. Lee would receive billing credit for the Play, with certain exceptions.  The billing credit would appear in substantially the following form: "Based on the novel 'To Kill a Mockingbird' written by Harper Lee."

16.     The Contract provides that Rudinplay would pay Ms. Lee certain royalties and certain net profits resulting from presentation of the Play.

17.     Rudinplay also agreed to certain limitations on its selection of the Playwright and the substance of the Play to be produced.

18.     Paragraph 12 of the Contract provides that Ms. Lee shall have "the absolute and unconditional right to approve the Playwright for the Play," and "the exercise of such right shall be within her sole and unfettered discretion."

19.     Paragraph 12 of the Contract further provides that Ms. Lee "shall have the right to review the script of the Play and to make comments which shall be considered in good faith by the Playwright."

20.     Paragraph 12 of the Contract further provides that "the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters."

## The Present Controversy

21.     Rudinplay procured Aaron Sorkin ("Mr. Sorkin") as the Playwright for the Play and submitted his name to Ms. Lee for the necessary approval.  Ms. Lee approved Mr. Sorkin as the Playwright for the Play on November 4, 2015.

22.     Following the approval of Mr. Sorkin, Rudinplay sent a check dated November 4, 2015, for $100,000.00 payable to Ms. Lee.

23.     After Ms. Lee's death in February 2016, the Estate became the successor to Ms. Lee as "Author" under the Contract.

24.     On September 13, 2017, *Vulture* reported on an interview that Kyle Buchanan conducted with Mr. Sorkin at the Toronto Film Festival.  When asked "how the younger characters Jem, Scout, and Dill are going to speak Sorkin," Mr. Sorkin responded, "Well, they're gonna have to.  Because I didn't write their language like they were children."

25.     According to *Vulture*, Mr. Sorkin in the interview also said, "As far as Atticus and his virtue goes, this is a different take on *Mockingbird* than Harper Lee's or Horton Foote's.  He becomes Atticus Finch by the end of the play, and while he's going along, he has a kind of running argument with Calpurnia, the housekeeper, which is a much bigger role in the play I just wrote.  He is in denial about his

neighbors, and his friends and the world around him, that is as racist as it is, that a Maycomb County jury could possibly put Tom Robinson in jail when it's so obvious what happened here.  He becomes an apologist for these people."

26.    The *Vulture* article also reports, "That adjustment not only gives Atticus a character journey from naivete to righteousness, it ties the 1930s-set *Mockingbird* to today's social climate."

27.    On September 13, 2017, *Playbill* published an article about the interview that Mr. Sorkin gave about the Play.  Based on the interview, *Playbill* reported, "When the curtain rises on the world premiere of Sorkin's *To Kill a Mockingbird*, audiences won't encounter the morally sound Atticus Finch they know."  *Playbill* also reported that Mr. Sorkin had previously said that it "doesn't work at all" to take the scenes that Ms. Lee wrote in the Novel and to dramatize them.

28.    On September 14, 2017, the Estate's literary agent Andrew Nurnberg ("Mr. Nurnberg") sent an email to Mr. Rudin expressing concern about the interview that Mr. Sorkin had given "before sharing his thoughts (and text) with Nelle's family."  Mr. Nurnberg also wrote, "I am aware that this is early days, and that the current script is not definitive, that you will still be working on this with Aaron.  But for this classic, it is really important that any spin put on the characters, not least Atticus, does not contradict the author's image of them and their *Weltanschaung*."

7

29.    On September 14, 2017, Mr. Rudin sent an email responding to Mr. Nurnberg.  Mr. Rudin assured Mr. Nurnberg that "[t]he Atticus of the book is the Atticus of the novel," and that "I am never going to fall anywhere outside the agreement."

30.    Ms. Carter (the Personal Representative of the Estate) first saw a draft of the Play in mid-September 2017.

31.    On or about September 22, 2017, Mr. Nurnberg had a telephone conversation with Mr. Rudin in which he underlined the importance of sticking to the original storyline and the characters as in the Novel.  Mr. Rudin assured Mr. Nurnberg that the script was only in draft form and that the text would evolve.

32.    On September 25, 2017, Mr. Rudin telephoned Ms. Carter in Monroeville, Alabama.  During that telephone conversation, Ms. Carter expressed concerns about the script.  Among other things, Ms. Carter discussed her concerns pertaining to the alteration of characters, including Atticus Finch and Calpurnia.  Ms. Carter also expressed a concern about the impact of the addition of two characters who were not in the Novel.  In addition, Ms. Carter expressed a concern that the script was not consistent with the setting of 1930s small-town Alabama.  Mr. Rudin assured Ms. Carter that he wanted to do the Play right and that he would make sure that the Estate would be satisfied with the final product.

33.     On September 28, 2017, after speaking with Ms. Carter about her telephone conversation with Mr. Rudin, Mr. Nurnberg sent an email to Mr. Rudin. In it, Mr. Nurnberg summarized his understanding that Mr. Rudin was in agreement with a basic premise:  "We are all agreed that the Atticus in the play must remain the Atticus of the book."

34.     On September 29, 2017, Mr. Rudin responded by email to Mr. Nurnberg.  Mr. Rudin said, "We're not looking to make any wholesale changes from what [Ms. Lee] did but simply to dramatize the book, which is sometimes very passive and more ruminative than dramatic."   He also said, "Remember you are reading a first draft of this material and that the process of making a play happens in workshops and rehearsals and previews.  It will change and grow as it should."

35.     Mr. Rudin did not send an updated version of the script to Ms. Carter or Mr. Nurnberg until February 13, 2018, even though Mr. Nurnberg had requested an updated version prior to that date.  Mr. Rudin waited to send the revised script until shortly before a scheduled meeting with Ms. Carter.  Ms. Carter read the entire revised script on the day that she received it.  Rather than addressing the concerns that Ms. Carter had expressed in September 2017, the new version of the script exacerbated her concerns.

36.     On February 16, 2018, Ms. Carter met with Mr. Rudin for one to two hours and again expressed serious concerns about the script.   At times, the

9

conversation was heated.  Ms. Carter again expressed her view that the script altered the characters of Atticus Finch and Calpurnia.  She also expressed concerns about alteration of the characters of Jem Finch and Scout Finch.  Ms. Carter also again stated her view that the script did not present a fair depiction of 1930s small-town Alabama (as Ms. Lee depicted it in the Novel), and she expressed concerns about significant alterations of the story pertaining to the legal proceedings against Tom Robinson.  During the meeting, Mr. Rudin resisted the comments that Ms. Carter was making.  At the conclusion of the meeting, Mr. Rudin said that the version of the script that had been sent to the Estate was a "working draft," and that the Estate's concerns would be considered at a number of upcoming "workshops."

37.    Between February 16, 2018, and March 5, 2018, Rudinplay did not send a new version of the script to Ms. Carter or Mr. Nurnberg.  Nor did Rudinplay express a willingness to make the substantial revisions to the Play required to bring it into compliance with Paragraph 12 of the Contract.

38.    As a follow-up to the verbal notifications to Mr. Rudin of the Estate's concerns that had been provided in September 2017 and February 2018, Ms. Carter sent a letter to Mr. Rudin on March 5, 2018, giving written notification of the Estate's position that the Play derogates or departs from the spirit of the Novel and that it alters five of the Novel's characters – Atticus Finch, Calpurnia, Tom

Robinson, Jem Finch, and Scout Finch (the "March 5 Letter").  A copy of that letter will be filed under seal as Exhibit B.

39.    On March 9, 2018, an attorney for Rudinplay sent a letter to Ms. Carter responding to the March 5 Letter (the "March 9 Letter").  With regard to the provision in Paragraph 12 of the Contract that "the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters," Rudinplay's lawyer asserted that "[e]ven if the Author believes that the Play derogates or departs from the spirit of the Novel, or alters its characters, the Author's remedy is that the Author 'will be afforded an opportunity to discuss with the Owner [Rudinplay] resolutions of any such concerns.  The Author is therefore not the final arbiter of what 'derogates or departs from the spirit of the Novel, or alters its characters.'"  Rudinplay thus takes the position that the Estate has no remedy if Rudinplay breaches this provision of the Contract other than the opportunity for the Estate to discuss its concerns with Rudinplay.

40.    In the March 9 Letter, Rudinplay's lawyer also denied that the Play derogates or departs in any manner from the spirit of the Novel, and he denied that the Play alters any of the Novel's characters.

41.    In the March 9 Letter, Rudinplay's lawyer, having indicated that the second and final actors' workshop with regard to the Play would occur in five weeks, also stated that "it is unreasonable to expect that extensive changes can be achieved

11

five weeks before the second workshop.  It simply is no longer possible, even if [Mr. Rudin] were in agreement with everything in your March 5 letter."

## COUNT ONE – DECLARATORY JUDGMENT

42.    Plaintiff incorporates and realleges as is set forth in full herein the allegations contained in paragraphs 1 through 41.

43.    There is an actual controversy between the Estate and Rudinplay concerning:

a.  Whether Paragraph 12 of the Contract requires that the Play not derogate or depart in any manner from the spirit of the Novel nor alter its characters;

b.  Whether Rudinplay has final authority to determine whether the Play derogates or departs in any manner from the spirit of the Novel or alters its characters;

c.  Whether the Play derogates or departs in any manner from the spirit of the Novel in its depiction of the legal proceedings against Tom Robinson;

d.  Whether the Play derogates or departs in any manner from the spirit of the Novel in its depiction of a small Alabama town in the 1930s;

e.  Whether the Play derogates or departs in any manner from the spirit of the Novel in connection with the other issues raised in the March 5 Letter;

f.  Whether the Play alters the character of Atticus Finch;

g.  Whether the Play alters the character of Calpurnia;

h.  Whether the Play alters the character of Tom Robinson;

i.  Whether the Play alters the character of Jem Finch; and

j.  Whether the Play alters the character of Scout Finch.

44.  The Estate maintains that:

a.  Paragraph 12 of the Contract requires that the Play not derogate or depart in any manner from the spirit of the Novel nor alter its characters;

b.  Rudinplay does not have final authority to determine whether the Play derogates or departs in any manner from the spirit of the Novel or alters its characters;

c.  The Play derogates or departs from the spirit of the Novel in its depiction of the legal proceedings against Tom Robinson;

d.  The Play derogates or departs from the spirit of the Novel in its depiction of a small Alabama town in the 1930s;

    e.   The Play derogates or departs from the spirit of the Novel in connection with the other issues raised in the March 5 Letter;

    f.   The Play alters the character of Atticus Finch;

    g.   The Play alters the character of Calpurnia;

    h.   The Play alters the character of Tom Robinson;

    i.   The Play alters the character of Jem Finch; and

    j.   The Play alters the character of Scout Finch.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Court will award the following relief:

1.    A declaratory judgment that:

    a.   Paragraph 12 of the Contract requires that the Play shall not derogate or depart in any manner from the spirit of the Novel nor alters its characters, and Rudinplay does not have final authority to determine whether the Play complies with that requirement.

    b.   The Play derogates or departs from the spirit of the Novel and thereby violates Paragraph 12 of the Contract in connection with its depiction of the legal proceedings against Tom Robinson.

    c.   The Play derogates or departs from the spirit of the Novel and thereby violates Paragraph 12 of the Contract in connection with its depiction of a small Alabama town in the 1930s.

d.  The Play derogates or departs from the spirit of the Novel and thereby violates Paragraph 12 of the Contract in connection with the other matters identified in the March 5 Letter.

e.  The Play alters the character of Atticus Finch and thereby violates Paragraph 12 of the Contract.

f.  The Play alters the character of Calpurnia and thereby violates Paragraph 12 of the Contract.

g.  The Play alters the character of Tom Robinson and thereby violates Paragraph 12 of the Contract.

h.  The Play alters the character of Jem Finch and thereby violates Paragraph 12 of the Contract.

i.  The Play alters the character of Scout Finch and thereby violates Paragraph 12 of the Contract.

2.  An award of attorneys' fees pursuant to Paragraph 13 of the Contract.

3.  An award of costs.

4.  Such additional relief as the Court may deem equitable and just.

*s/ Matthew H. Lembke*
Matthew H. Lembke
Attorney for Plaintiff

15

OF COUNSEL

Matthew H. Lembke
Jeffrey M. Anderson
Ellen Presley Proctor
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800


SERVE COMPLAINT BY CERTIFIED MAIL TO:

Rudinplay, Inc.
c/o Mr. Scott Rudin
Citrin Cooperman & Co.
529 Fifth Avenue, 4th Floor
New York, New York 10017