# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

RUDINPLAY, INC.,                                    :

               Plaintiff,                      :      Civil Action No. 18-cv-03300-AT

         -against-                           :      Hon. Analisa Torres

THE ESTATE OF NELLE HARPER LEE and :   **DECLARATION OF SCOTT RUDIN**
TONJA B. CARTER,

              Defendants.                     :

------------------------------------------------------------ X

     I, SCOTT RUDIN, declare as follows:

     1.     I am the President of Rudinplay, Inc. ("Rudinplay"), a theatrical production company and the plaintiff in this action. I respectfully submit this declaration in support of Rudinplay's motion, brought by Order to Show Cause, for expedited discovery and expedited resolution of Rudinplay's declaratory judgment claims, and to require that certain confidential material be filed under seal.

**Rudinplay Acquires an Option to Adapt _To Kill a Mockingbird_ into a Live Stage Play, and Incurs Significant Expenses Preparing for the Play's Broadway Premiere**

     2.     As explained in greater detail in Rudinplay's complaint in this action (the "Complaint"), and in its accompanying memorandum of law, this action arises out of an agreement (the "Agreement"), dated as of June 29, 2015, that Rudinplay entered into with the author Harper Lee, by which Rudinplay acquired certain rights to adapt Ms. Lee's acclaimed novel _To Kill a Mockingbird_ (the "Novel") into a live stage play. A true and correct copy of the Agreement is annexed as Exhibit A hereto.

     3.     Paragraph 1 of the Agreement provided that Rudinplay would have a twelve-month period in which to procure a playwright to create a dramatic adaptation of the Novel for

presentation of a live stage play (the "Play"). The Agreement provided that the choice of the playwright would be subject to Ms. Lee's written approval, in her absolute discretion. Prior to Ms. Lee's passing, I successfully procured Aaron Sorkin, one of the leading theater, film and television writers in America, as the playwright for the Play, and Ms. Lee approved the selection of Mr. Sorkin as playwright in accordance with the Agreement.

4.      Paragraphs 2(a) and 3 of the Agreement together provide that, upon having obtained Ms. Lee's approval of the playwright (and paying to Ms. Lee the sum of $100,000), Rudinplay would receive an option (the "Option") to acquire certain live stage rights in and to the Novel, that the initial term of the Option would be twenty-four (24) months, and that Rudinplay could extend the Option period by an additional twelve (12) months by paying an additional $50,000. Paragraph 3 of the Agreement contained additional terms for further extensions relating to, among other things, the availability of a star, director or theater, and the performances of developmental productions.

5.      In accordance with these provisions, Rudinplay paid Ms. Lee (through her London-based literary agent, Andrew Nurnberg), the sums of $100,000 on November 10, 2015, and $50,000 on September 11, 2017, in order to procure, and extend, its Option.

6.      Paragraph 4 of the Agreement provides that, in order to exercise its Option, Rudinplay must present an initial commercial first class production of the Play, either on Broadway or in the West End of London, within the applicable Option period.

7.      Rudinplay has incurred significant expenses preparing the Play for a first class production within the applicable Option period. In addition to retaining Mr. Sorkin as playwright, Rudinplay has retained a director (Bartlett Sher, the resident director of Lincoln Center Theater, a Tony Award winner and a seven-time Tony nominee), has cast the play (including engaging the acclaimed actor Jeff Daniels to portray Atticus Finch) and entered into

contracts with cast members, has scheduled and funded numerous developmental workshops, has contracted with a general management company for the production, and has reserved a theater for the Play's anticipated Broadway premiere. The Play is currently scheduled to premiere, on Broadway, in December 2018.

### Following Harper Lee's Death, Defendant Tonja B. Carter Purports to Act as the Personal Representative of Ms. Lee's Estate, and Belatedly Claims that the Play Departs from the "Spirit" of the Novel

8.     I understand that, following Ms. Lee's death, one of the Defendants, Tonja B. Carter, has purported to act as the personal representative of Ms. Lee's Estate (the "Estate").

9.     In August 2017, I directed Rudinplay's agents to send a draft of the script for the Play to the Estate through Andrew Nurnberg, Ms. Lee's London-based literary agent. Prior to Ms. Lee's death I had dealt extensively with Mr. Nurnberg in connection with the negotiation and execution of the Agreement, and I continued to deal with him in connection with the Agreement following Ms. Lee's death.

10.     On or around September 25, 2017, I had a brief telephone conversation with Ms. Carter, during which Ms. Carter made a minor comment concerning the script regarding what she perceived to be "passive aggression" between the characters of Atticus and Calpurnia.

11.     Following my conversation with Ms. Carter, on September 28, 2017, I received an email from Mr. Nurnberg, in which Mr. Nurnberg stated that "I had Tonja [Carter] on the phone, and she was really delighted by her conversation with you. We are all agreed that the Atticus in the play must remain the Atticus of the book." I responded to Mr. Nurnberg the next day, noting that, while there would necessarily be some differences between the Play and the Novel owing to the different mediums, the Play would certainly remain true to the Novel's ethos. A true and correct copy of this email exchange is annexed as Exhibit B hereto.

12.     Other than the minor comments conveyed during the September 25, 2017 telephone call, and in the September 28, 2017 email, neither Ms. Carter nor Mr. Nurnberg offered any substantive comments concerning the script.

13.     On or around February 13, 2018, I sent an updated draft script to Mr. Nurnberg and Ms. Carter, which contained some minor revisions but was, in all material respects, substantially similar to the version that I had previously sent in August 2017.

14.     Three days later, on February 16, 2018, I met with Ms. Carter and Mr. Nurnberg in New York, New York. During that meeting, Ms. Carter raised purported "objections" to the Play that neither she nor Mr. Nurnberg had ever previously asserted.

15.     On March 5, 2017, Ms. Carter sent a letter to me (the "March 5 Letter") in which she purported to raise, for the first time, a litany of additional objections to the script. Among other things, the March 5 Letter asserted that the script for the Play "altered" the characters of Atticus Finch, Calpurnia, Tom Robinson, Jem Finch and Scout Finch, and somehow "derogated or departed" from the spirit of the Novel in several ways.

16.     My attorney responded to the March 5 Letter on March 9, 2018 (the "March 9 Letter"). A true and correct copy of the March 9 Letter is annexed as Exhibit C hereto.

17.     I believe that Ms. Carter's belatedly-raised "objections" to the script are a pretense, designed to result in the cancellation of the Play for an ulterior purpose. Specifically, I have had a number of communications with Mr. Nurnberg (including one on February 9, 2018) in which he conveyed to me that the Estate was involved in arbitration proceedings, or some other dispute, with the estate of the actor Gregory Peck (the star of the film adaptation of the Novel) concerning the stage rights to the Novel.

18.     Mr. Nurnberg did not share the specifics of the dispute with me, and I do not know whether it has been resolved. However, he did acknowledge that, if the Peck heirs raised

any claim against Rudinplay relating to a claim of ownership of stage rights to the Novel, the Estate would be obligated to indemnify Rudinplay. Given the timing of this communication (just days before Ms. Carter raised her "objections"), I believe that Ms. Carter wishes for the Play to be canceled, so that the Estate may avoid potential liability to the Peck Estate, potential indemnification obligations to Rudinplay, or both.

## Defendants' False Claims are Preventing Rudinplay from Exercising its Option, and Are Causing Irreparable Harm

19.    Rudinplay is suffering, and will continued to suffer, irreparable harm if this dispute with the Estate is not resolved in the immediate future.

20.    As explained above, under the Agreement, in order to exercise its Option to acquire live stage rights to the Novel, Rudinplay must present an initial commercial first class production of the Play within the Option period. In order for the Play to premiere as scheduled in December 2018, Rudinplay will need to raise millions of dollars in additional capitalization. The present dispute, however, has rendered it impossible to raise the necessary capitalization, as reliable investors are not willing to invest millions of dollars when a cloud exists over Rudinplay's rights. Accordingly, if the present dispute is not resolved in the immediate future, my company will not be able to raise the necessary capitalization, the cast will be released from its commitments, and the reservation of the theater, and the Play, will be canceled.

21.    It is difficult, if not impossible, to determine the profits that my company would lose if it is deprived of the opportunity to stage the Play on Broadway. Among other things, this would depend on the degree of success that the Play might achieve, and how long it might run. It is also impossible to determine the profits that my company would lose resulting from the lost opportunity to stage subsequent first-class productions (including on the West End of London)

and touring productions, or from the exploitation of stock and amateur rights, and other subsidiary rights, in the Play.

22.     Rudinplay, and I personally, will also suffer reputational harm if I am forced to cancel the Play at this late date, including with respect to the talented cast members and director who have committed to participating in the Play, as well as the theater owner and general management company with whom Rudinplay contracted. This reputational harm may damage Rudinplay's future business opportunities in ways that are impossible to quantify.

23.     In order to facilitate expedited resolution of its declaratory judgment claims, Rudinplay is willing to arrange for an immediate performance of the Play, by as much of its full Broadway cast as is possible, to take place in the Courthouse, for the Court and jury's benefit.

**Confidential Information Concerning the Play, an Unpublished Work, Should be Filed Under Seal**

24.     The Play has yet to be publicly performed, and the script for the Play has not been published.

25.     As an unpublished work, the market for the Play would likely be damaged if the script were prematurely disclosed to the public. If the all or some of the script for the Play, or significant plot points, are revealed before Rudinplay is prepared to present the Play for public consumption, it could reduce theatergoers' interest in the Play and thus harm the value of the work.

26.     I understand that Ms. Carter or the Estate may seek to file the script for the Play, or the March 5 Letter (which quotes extensively from the script and reveals numerous details concerning the plot) as exhibits in this action. To avoid unnecessarily harming the market for the Play, I respectfully request that, to the extent such document (or other documents or materials that reveal substantial plot points) are filed as exhibits in this action, they be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of April 2018, at New York, New York.

SCOTT RUDIN

Exhibit A

**RUDINPLAY, INC.**
**120 West 45th Street, 10th Floor**
**New York, New York 10036**

As of 29 June, 2015

Ms. Harper Lee
c/o Andrew Nurnberg Associates International
20-23 Greville Street, London EC 1N 8SS
United Kingdom;

Re:    "To Kill a Mockingbird" Live Stage Rights

Dear Ms. Lee:

This letter agreement ("**Agreement**") sets forth the material deal terms that have been agreed upon between Rudinplay, Inc. ("**Producer**") and you ("**Author**") in connection with the live stage and ancillary rights in and to the novel entitled "To Kill a Mockingbird" written by you (the "**Novel**").

1.    Agency.

Commencing with the date of this Agreement and continuing for a period of twelve months thereafter, Author designates Producer as her sole and exclusive agent (the "Agency") to procure a playwright (the "Playwright") to create a dramatic adaptation of the Novel for presentation as a live stage play (the "Play"). The choice of the Playwright shall be subject to the written approval of Author in her sole and absolutely unfettered discretion. Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof during the term of the Agency. In the event the Producer fails to procure a Playwright acceptable to the Author during the term of the Agency, then upon the expiration of the Term the Agency shall terminate absolutely without further notice. For the avoidance of any doubt, the written approval of the Playwright by the Author is a condition precedent to any grant of rights to the Producer in the Novel pursuant to this agreement.

2.    Grant of Rights.

(a)    Upon having obtained the written approval of the Author to the Playwright, Author shall thereby grant to Producer and its licensees and assignees the sole and exclusive option (the "**Option**") to acquire, on an exclusive (subject to Paragraph 2 (b) below), worldwide basis, all live stage rights in and to the Novel and all subsidiary and ancillary rights related to such live stage rights, including without limitation: (i) the right to create, develop, produce and present a live stage play (the "**Play**") based on and using the Work and any and all elements thereof (including without limitation the right to present the Play in first and non-first class touring and sit-down productions), (ii) the right to use the title "To Kill a Mockingbird" in connection with the Play, and (iii) the right to exploit all customary advertising rights in all media, merchandising rights and stock and amateur licensing rights (subject to Paragraph 1(b) below). It shall be a condition precedent to the approval of the Playwright that the Playwright shall agree in writing that any grant of stock and amateur licensing rights is to be contingent on: (i) an annual professional performance of the Play in Monroeville, AL, (ii) a prohibition against any license for performance of the Play by or under the auspices of the Monroe County Museum or to any successor or affiliated entity, organization or individual, and (iii) a restriction against any license for performance of the Play within sixty (60) miles of the city limits of Monroeville, AL.

(b)    Producer acknowledges that pursuant to an agreement (the "**Prior Agreement**") dated June 26, 1969 between Author and The Dramatic Publishing company ("**DPC**"), Author granted DPC the right to create a play (the "**Prior Adaptation**") based on the Novel, and to exploit the amateur acting rights (as defined in the

Prior Agreement) in the Prior Adaptation. Author represents that it has terminated the Prior Agreement effective April 26, 2016. Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

3.     Option Periods and Payments.

(a)     In consideration for Author's grant of the Option, Producer shall pay to Author the sum of $100,000, payable upon the Author's written approval of the Playwright. The initial term of the Option shall commence upon payment of the $100,000.00 and shall continue for twenty-four (24) months thereafter. Producer may extend the Option term for an additional twelve (12) months by paying to Author $50,000. Producer shall have the right to further extend the Option term for up to an additional consecutive six (6) months solely to accommodate the availability of a star, director or theater. The foregoing Option extension payment shall be due prior to the expiration of the initial Option period. The initial Option period or then-current extension period (as applicable) will be extended by the number of days of performances of any workshop, regional theater or other developmental production ("**Developmental Production**") that occurs during such period, plus sixty (60) days. The initial Option period and any extensions thereof as set forth above shall be referred to herein collectively as the "**Option Period**".

The initial Option payment shall be non-returnable, and shall be recoupable from Author's royalties. The Option extension payment shall be nonreturnable, and shall be recoupable from half of Author's royalties after recoupment

4.     Exercise of Option. The initial commercial first class production of the Play presented on Broadway or in the West End of London under Producer's original agreement with the Playwright (the "**Playwright Agreement**") shall be referred to herein as the "**Initial Production**". The Option will be deemed exercised if the first paid public performance of the Initial Production is presented within the Option Period. Producer shall have the right to present a pre-Broadway or pre-West End developmental production, either at a not-for-profit theater or as a commercial engagement.

5.     Royalties.

(b)     On a company-by-company basis, with respect to each production of the Play that is presented by or under license from Producer prior to the expiration of Producer's production rights under the Playwright Agreement in the applicable territory (each, a "**Production**") and for which royalties are based on gross weekly box office receipts, less customary deductions ("**GWBOR**"), or Company Share (as customarily defined), Author shall be entitled to receive a royalty equal to an amount not less than two-thirds (2/3) of 6% of GWBOR or company share, increasing to 12% upon 110% of recoupment (as customarily defined in the theatrical industry). Any requirement hereunder that Author receive no less than a certain share of any amounts (*e.g.*, royalties, Subsidiary Rights revenues) payable to the Playwright shall be understood to apply to the amounts payable to the original Playwright, it being understood that in the event Producer subsequently engages any additional or replacement writer and is required to pay amounts to such party in excess of (*i.e.*, not deducted from) the amounts payable to the original Playwright, Author shall not be entitled to its minimum share of such excess. Furthermore, in no event will Author be entitled to share in, or receive additional compensation as a result of, any compensation payable to the Playwright for services rendered by such party in connection with the Play in a capacity other than as an author of the Play, provided that such compensation is not designed to reduce Author's compensation hereunder.

(c)     Notwithstanding the foregoing, with respect to any Developmental Production from which Playwright is entitled to receive a royalty, Author's royalty shall be paid out of, and not in addition to, Author's royalty, and Author shall receive not less than two-thirds (2/3) of the Playwright's royalty from such Developmental Production, it being understood and agreed that Author shall not be entitled to receive a royalty from any Developmental Production from which Playwright is not entitled to receive a royalty.

(d)    Notwithstanding anything to the contrary contained in this Paragraph 5, Author agrees that if Playwright agrees to any alternative royalty calculation (including royalties based on weekly operating profits) and/or any adjustment, deferral, waiver, amortization and/or reduction of percentage royalties and/or minimum weekly guarantees with respect to any Production, Author shall in good faith also consider agreeing to such calculation, adjustment, deferral, waiver, amortization or reduction with respect to Author's royalties under this Paragraph 4 on the same proportionate basis and to the same extent. For the avoidance of doubt, Author shall not receive both a royalty and a share of Subsidiary Rights revenues from the same production of the Play.

6.    Subsidiary Rights.  Author shall be entitled to two-thirds (2/3) of 100% of the Playwright's Net Compensation from the sale or other disposition of Subsidiary Rights (as customarily defined) in and to the Play. For purposes hereof, "**Playwright's Net Compensation**" shall be defined as all gross receipts actually received by Playwright from the sale or other disposition of all Subsidiary Rights in and to the Play, less customary commissions payable to a stock and/or amateur licensing agent or any other agent or representative (not to exceed 10% of such gross receipts in the aggregate, except with regard to amateur licenses, for which such commissions shall not exceed 20% of such gross receipts in the aggregate), any participations therein payable to Producer (which shall be as set forth in the Minimum Basic Production Contract, or the Approved Production Contract, of the Dramatists Guild), and any share that Author grants to a director and/or choreographer of the Play, Actors Equity, a theater that presents a Developmental Production or any other third party.

7.    Net Profits.  In addition to the royalty set forth above, Producer shall pay (or cause to be paid) to Author 2.5% of 100% of the net profits of the company ("Original Company") which finances and presents the Initial Production. "Net profits" shall be computed, defined and paid in the same manner as for investors in the Original Company.

8.    Merger.  If Producer presents at least twenty-one (21) paid public performances (including an official press opening but not including previews) of the Play on Broadway or the West End of London, then the Novel and the Play shall "merge" (as such term is customarily understood in the live stage theatrical industry) and the rights granted by Author under this agreement shall become exclusively granted to Producer and Playwright (as their respective interests may appear) for a period of seven (7) years after there has been a hiatus of 90 days in which no productions of the Play have been presented in the United States and Canada or the United Kingdom under the auspices of Producer (the "Exclusive Period"), and thereafter on a non-exclusive basis for the duration of the original and all renewal and extended terms of all copyrights in the Novel. Producer hereby agrees that, in the event merger occurs as set forth in this paragraph 6, Producer shall be deemed to have assigned to Playwright all rights in the Novel granted to Producer hereunder, subject, however, to Producer's production and/or other rights in and to the Play as set forth in this agreement and in Producer's agreement with the Playwright. Producer agrees that the rights granted to Producer under this agreement will terminate unless merger occurs within 12 months from the exercise of the Option.

9.    Holdback.  Except as provided below, commencing with the date of this Agreement and continuing the earliest of (i) the termination of the Agency for failure to have obtained the written approval of the Author to a Playwright during the term of the Agency, (ii) Producer's failure to exercise the Option prior to the expiration thereof or failure to achieve merger as set forth above prior to the expiration of Producer's production rights hereunder, and (iii) if the Option is timely exercised and merger occurs, for the duration of the Exclusive Period, Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof (subject to Paragraph 2(b) above).

10.    Billing.  Author will receive billing credit wherever and whenever Playwright is afforded billing credit, except for radio, television, mobile and internet banner and pop-up advertising, vehicular advertising and print advertisements of one-quarter page or less (unless any party receives billing credit in such excluded advertising other than Playwright, director, producers, stars and theater), and subject to customary exclusions for award and congratulatory ads, use of critics' quotes and the customary right to use a billing box or movie-style run-on billing. Such credit will appear immediately following Author's credit, in a type size no less than 100% of the

size of Playwright's credit, in substantially the following form: "Based on the novel 'To Kill a Mockingbird' written by Harper Lee". All other billing terms not expressly provided herein shall be in Producer's sole discretion.

11.    Representations. Warranties and Indemnities.

(e)    Author hereby represents and warrants that: (i) Author has not assigned or licensed to any person and/or entity, and has not entered into any agreements to place any lien or encumbrance upon, the rights in the Novel that would derogate from or conflict with the rights granted hereunder (subject to the provisions of Paragraph 2(b) above); (ii) there are no claims, litigation or other proceedings pending or threatened which could in any way conflict with the rights granted hereunder; (iii) the Novel, except to the extent that it is based upon or taken from material in the public domain, is wholly original with Author; (iv) Author has the sole and full right and authority to enter into this Agreement and to grant the rights granted hereunder; and (v) there are no third parties from whom any clearances, releases, consents and/or permissions may be necessary for Producer to obtain to exploit any rights to the Work granted hereunder, and the exercise of such rights will not violate any personal, contractual, proprietary or other rights of any third party.

(f)    Author agrees to indemnify and hold harmless Producer and Playwright, and their respective affiliates, officers, directors, employees, agents, successors, assignees, licensees and any other parties claiming by or through Producer and/or Playwright, from and against any and all third party claims (including any amounts paid in settlement, subject to the indemnitor's prior written consent, not to be unreasonably withheld), liability, demands, suits, losses, costs, expenses (including reasonable attorneys' fees and disbursements), damages, judgments or recoveries (collectively, "**Claims**") which may be made against or suffered or incurred by Producer, Playwright and such others arising out of or in connection with any breach of any representations, warranties or agreements made by Author hereunder

(g)    Producer shall indemnify and hold harmless Author (or require in writing any assignee(s) and/or licensee(s) of Producer's rights hereunder to indemnify and hold harmless Author), from and against any and all Claims which may be made against or suffered or incurred by Author arising out of or in connection with the development, production and exploitation of the Play and which do not arise from or in connection with a breach of Author's representations, warranties or agreements contained herein.

12.    Approvals. Author shall have the absolute and unconditional right to approve the Playwright for the Play. Such right of approval of Author hereunder shall be a right of prior, written approval, and Author's exercise of such right shall be within her sole and unfettered discretion.. Author shall also have the right to review the script of the Play and to make comments which shall be considered in good faith by the Playwright, and the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters. If the Author believes that the Play does so derogate or depart, or alter characters, Producer will be given notice thereof as soon as possible, and will be afforded an opportunity to discuss with Owner resolutions of any such concerns.

13.    Breach. Anything herein to the contrary notwithstanding, in the event of any default in the payment of any sum of money or other default by Producer or Playwright, as their respective interests may appear, under this Agreement, if Author has provided reasonable notice of such default and a reasonable opportunity to cure such default, Author shall be entitled to an award of reasonable legal fees incurred in the enforcement of her rights hereunder in addition to her remedies at law and in equity.

14.    House Seats; Travel. For the official press opening performance of each of the initial Broadway and West End Productions, Author shall be entitled to receive two (2) complimentary tickets to such performance along with accompanying complimentary passes to any opening night party. If such performance occurs more than 100 miles from the current residence of either Author or her designees who will use such tickets, Producer will provide each such person with (i) one (1) business class roundtrip airfare, (ii) ground transportation to and from airports, (iii) first class hotel accommodations for 2 nights, and (iv) a per diem of $125.

15.     Long-Form Agreement. The parties hereto intend to enter into a long-form agreement containing the foregoing terms at such time as the parties so elect, which agreement will also contain all other terms and conditions customarily included in agreements of this nature, subject to good faith negotiations.

16.     Miscellaneous. All matters concerning this Agreement and its validity, performance or breach shall be governed by the law of the State of New York applicable to contracts made and performed entirely therein. This Agreement may be executed in several counterparts, all of which when signed shall constitute a single agreement. Facsimile and PDF copies of this Agreement and signatures thereon shall be valid and binding on the parties.

Please confirm your agreement to the foregoing by signing your name where indicated below.

Very truly yours,

RUDINPLAY, INC.

By: _____

An Authorized Officer

ACCEPTED AND AGREED:

By: _____

HARPER LEE

5

**Exhibit B**

**From:** Scott Rudin <sr@scottrudinproductions.com>
**Date:** Friday, September 29, 2017 at 6:49 AM
**To:** Andrew Nurnberg <ANurnberg@nurnberg.co.uk>
**Subject:** Re: TKAM

I think it's actually less a general statement than what you are saying re Atticus below --- it is simply that we are in a process, which will go on until the play is open, and that Atticus (and all of the characters) will evolve as we go. Remember you are reading a first draft of this material and that the process of making a play happens in workshops and rehearsals and previews. It will change and grow, as it should. We're not looking to make any wholesale changes from what Nelle did but simply to dramatize the book, which is sometimes very passive and more ruminative than dramatic. We must always have forward motion happening in the narrative, and while some of that might be slightly different than the book, it is not ever intended to change anything about the ethos of the book. We may want to draw events or relationships slightly differently than Nelle did because we have to have drama occurring (whereas the book does not), and because it is conflict that makes for drama --- but I do not think any of what we're doing would ever make anybody who loves the book feel remotely like they were not getting the book onstage.

I was referring to Watchman more specifically in terms of the interview with Aaron that you read in Vulture than re the play itself --- but the point remains very much the same: we are going to have to deal with the disparity between TKAM and Watchman in how we talk about the play, and we clearly all need to be in front of it. I don't think we will ever be fully out from under it but I also think it is easily managed if we are all on the same page.

1

**From:** Andrew Nurnberg <ANurnberg@nurnberg.co.uk>
**Date:** Thursday, September 28, 2017 at 1:24 PM
**To:** Scott Rudin <sr@scottrudinproductions.com>
**Subject:** TKAM

Dear Scott,

Just rushing off, but the briefest of notes to say that I had Tonja on the phone, and she was really delighted by her conversation with you. We are all agreed that the Atticus in the play must remain the Atticus of the book.

She told me that the reason Aaron had depicted Atticus in the way that he has is because he wants to prepare/effect a transition to the Atticus of GO SET A WATCHMAN. But, as Tonja so rightly says, the original Atticus was a younger man, seen through the eyes of a child. If and when we make a second play (and hopefully Aaron will be up for writing this, too), then we will have the older, more entrenched Atticus.

I'll give you a shout just as soon as we know how things are progressing on the film front for WATCHMAN.

All best,
Andrew

**Andrew Nurnberg Associates International**
**20-23 Greville Street, London EC1N 8SS**
**Tel: +44 20 3327 0400 Fax: +44 20 7430 0801**
**email: anurnberg@nurnberg.co.uk**
**Follow us on Twitter @nurnberg_agency**
**www.andrewnurnberg.com**

Disclaimer The information contained in this communication from the sender is confidential. It is intended solely for use by the intended recipient and others authorised to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. This email has been scanned for viruses and malware, and may have been automatically archived.

**Exhibit C**



**JONATHAN ZAVIN**
Partner

345 Park Avenue
New York, NY 10154

Direct   212.407.4161
Main    212.407.4000
Fax      212.658.9105
jzavin@loeb.com

Via E-mail
Via U.S. Mail

March 9, 2018

Tonja B. Carter
Post Office Box 278
Monroeville, AL  36461

Re:   *To Kill A Mockingbird* ("TKAM")

Dear Ms. Carter:

We are counsel for Rudinplay, Inc.  This is in response to your letter to Scott Rudin dated March 5, 2018, regarding the upcoming live stage production of TKAM ("the Play").

First, I want to make it clear that Scott, and Rudinplay, want to work with the Estate of Harper Lee, as appropriate, regarding this project.  In that regard Scott would be very happy to get together with you.  While he appreciates the offer to come to Monroeville, his schedule is such (with three plays in production) that the meeting would need to be in New York.  In anticipation of that meeting to discuss your concerns regarding the present script for the production, however, we need to point out the following:

1.      The June 29, 2015 Agreement between Harper Lee and Rudinplay regarding the live stage and other ancillary rights to TKAM ("the Agreement") provides limited approval rights to Ms. Lee or her Estate (together "the Author").  The Author had absolute approval rights over the selection of the playwright for the Play.  This approval right was provided to give Ms. Lee comfort that the writer chosen was of sufficient talent and stature to do justice to her work.  The writer chosen was Aaron Sorkin, one of the leading writers in America today, and Ms. Lee and her assignees approved of that selection.  Once the writer was approved, however, Ms. Lee's right of approval was exhausted and paragraph 12 provides that the Author has only the right "to review the script of the Play and to make comments which shall be considered in good faith by the playwright...."  Even if the Author believes that the Play derogates or departs from the spirit of the Novel, or alters its characters, the Author's remedy is that the Author "will be afforded an opportunity to discuss with the Owner [Rudinplay] resolutions of any such concerns.  The Author is therefore not the final arbiter of what "derogates or departs from the spirit of the Novel, or alters its characters."  That notwithstanding, we are eager to discuss the issues raised in good faith by the Estate and to have a dialogue about these issues.

2.      Scott does not feel the present draft of the script of the Play either derogates or departs from the spirit of the Novel or alters its characters.  Clearly the Play was anticipated to be, and could only be, different from the Novel.  The Play focuses on one part of the Novel, the trial of Tom Robinson.  The Play's emphasis is therefore different than the Novel's, as well as the movie based on the novel.  Further, a live stage play has inherent limitations, and profound

For the United States offices, a limited liability partnership including professional corporations. For Hong Kong office, a limited liability partnership.

16044061.2
227691-10003



obligations, in its available means of expression found neither in a novel or a movie.  As one example only, the lead actors in a Broadway stage play cannot be 7 or 10 year old children, as children could not possibly carry these roles eight times every week, so the characters of Jem, Scout and Dill have to be played by older actors.  It was thus never expected that the Play would merely be the recitation of the Novel from the stage of a theater.  The script of the Play may add to the Novel, but it does not derogate or depart from the spirit of the Novel, nor alter the fundamental natures of the characters in the Novel.  I note in this respect that Ms. Lee herself added to the Novel and its characters (and gave them a different perspective) when she published *Go Set A Watchman* (which is not used in the Play), despite the order in which the two books were written, and I'm sure that she did not do so in derogation of the Novel or a departure from its spirit.

3.       As stated above, Aaron Sorkin is one of the leading writers in America.  He would hardly be needed to write the Play if the intent was to merely do a transcription of the Novel on the stage.  Presumably Ms. Lee was well aware that Mr. Sorkin would be bringing his perspective and talent to the Play, and that the Play would not be identical in all respects to the Novel.  Mr. Sorkin has, in fact, brought to the Play exactly the type of perspective that Ms. Lee presumably anticipated, and that any writer of such stature would be expected to reasonably attempt.  In any adaptation of a work, particularly a longer work into a shorter work, choices have to be made, material has to be left out, and new material added to make a cohesive whole.  Further, in an adaptation, as opposed to a mere abridgment, the author brings his own perspective and views to the work, and does not merely copy the pre-existing work.  Rather, an adaptation, such as an adaptation of the Novel into the Play, changes the work to suit the conditions and needs of the theater, which include need for more immediate drama, conflict and timeliness.  The Play is an adaptation, but it is certainly not derogatory of the Novel, nor does it depart from its spirt or change the nature of its characters.

4.       There is a limited time to make extensive changes in the script.  The second and last workshop for the Play is approximately five weeks away.  Actors and a director have been retained for this workshop, and space retained.  A theater has been reserved for the Play to open in December 2018.  The Play is cast and the company is contracted.  These are realities that cannot be ignored.

5.       The limited time to make changes in the script has been exacerbated by the fact that virtually this same script was sent to you more than six months ago, on August 24, 2017, through Andrew Nurnburg.  It is my understanding that there were almost no comments made by you regarding the script up until your letter of March 5, after an almost identical script was sent to you on January 27, 2018.  The only two comments that Scott recalls receiving on this first script was first, a comment regarding the discussion of passive aggression between Atticus and Calpurnia, and he believes that was fixed pursuant to that comment.  The second comment was in an e-mail dated September 28, 2017, to Scott from Andrew Nurnberg, in which he conveyed your concern that the Atticus in the Play not progress to the older Atticus in *Go Set A Watchman*.  Scott responded to Andrew the very next day, September 29, explaining that "[W]e're not looking to make any wholesale changes from what Nelle did but simply to dramatize the book, which is sometimes very passive and more ruminative than dramatic."...  "We may want to draw events or relationships slightly differently than Nelle did because we have to have drama occurring (whereas the book does not), and because it is conflict that makes for



Tonja B. Carter
March 9, 2018
Page 3

drama...." Since that e-mail on September 29, 2017 until your letter of March 5, 2018, more than five months later, Scott hasn't received any other written comments from you or Andrew. Even at your meeting with Scott a few weeks ago, I understand that you had many fewer reservations about the script, and didn't raise many of the comments that are in your March 5, 2018 letter.  Having waited so long to make comments, it is unreasonable to expect that extensive changes can be achieved five weeks before the second workshop.  It simply is no longer possible, even if Scott were in agreement with everything in your March 5 letter.

Despite the foregoing, as I stated in the beginning, Scott would like to consult with you to discuss with you your concerns, and to see if it is possible to resolve at least some of them. Please let Scott know when it would be convenient for you to come to New York to meet with him.  Given the timing of the production of the Play, this meeting should certainly be sooner rather than later.

If you have any questions about anything in this letter, please feel free to also contact me directly.  As I'm sure you understand, nothing in this letter constitutes an admission of any kind, or a waiver of any rights or remedies that RudinPlay may have, all of which are specifically reserved.

Sincerely,

Jonathan Zavin
Partner

cc:     Scott Rudin
        Andrew Nurnberg (via e-mail)