# EXHIBIT C

**RUDINPLAY, INC.**
120 West 45th Street, 10th Floor
New York, New York  10036

As of  29 June, 2015

Ms. Harper Lee
c/o Andrew Nurnberg Associates International
20-23 Greville Street, London EC 1N 8SS
United Kingdom;

Re:    "To Kill a Mockingbird" Live Stage Rights

Dear Ms. Lee:

This letter agreement ("**Agreement**") sets forth the material deal terms that have been agreed upon between Rudinplay, Inc. ("**Producer**") and you ("**Author**") in connection with the live stage and ancillary rights in and to the novel entitled "To Kill a Mockingbird" written by you (the "**Novel**").

1. Agency.

Commencing with the date of this Agreement and continuing for a period of twelve months thereafter, Author designates Producer as her sole and exclusive agent (the "Agency") to procure a playwright (the "Playwright") to create a dramatic adaptation of the Novel for presentation as a live stage play (the "Play").  The choice of the Playwright shall be subject to the written approval of Author in her sole and absolutely unfettered discretion.  Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof during the term of the Agency.  In the event the Producer fails to procure a Playwright acceptable to the Author during the term of the Agency, then upon the expiration of the Term the Agency shall terminate absolutely without further notice.  For the avoidance of any doubt, the written approval of the Playwright by the Author is a condition precedent to any grant of rights to the Producer in the Novel pursuant to this agreement.

2. Grant of Rights.

(a) Upon having obtained the written approval of the Author to the Playwright, Author shall thereby grant to Producer and its licensees and assignees the sole and exclusive option (the "**Option**") to acquire, on an exclusive (subject to Paragraph 2 (b) below), worldwide basis, all live stage rights in and to the Novel and all subsidiary and ancillary rights related to such live stage rights, including without limitation: (i) the right to create, develop, produce and present a live stage play (the "**Play**") based on and using the Work and any and all elements thereof (including without limitation the right to present the Play in first and non-first class touring and sit-down productions), (ii) the right to use the title "To Kill a Mockingbird" in connection with the Play, and (iii) the right to exploit all customary advertising rights in all media, merchandising rights and stock and amateur licensing rights (subject to Paragraph 1(b) below).  It shall be a condition precedent to the approval of the Playwright that the Playwright shall agree in writing that any grant of stock and amateur licensing rights is to be contingent on: (i) an annual professional performance of the Play in Monroeville, AL,  (ii) a prohibition against any license for performance of the Play by or under the auspices of the Monroe County Museum or to any successor or affiliated entity, organization or individual, and (iii) a restriction against any license for performance of the Play within sixty (60) miles of the city limits of Monroeville, AL.

(b) Producer acknowledges that pursuant to an agreement (the "**Prior Agreement**") dated June 26, 1969 between Author and The Dramatic Publishing company ("**DPC**"), Author granted DPC the right to create a play (the "**Prior Adaptation**") based on the Novel, and to exploit the amateur acting rights (as defined in the

NY1301454.6_076169-10002

Prior Agreement) in the Prior Adaptation. Author represents that it has terminated the Prior Agreement effective April 26, 2016. Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

3. Option Periods and Payments.

(a) In consideration for Author's grant of the Option, Producer shall pay to Author the sum of $100,000, payable upon the Author's written approval of the Playwright. The initial term of the Option shall commence upon payment of the $100,000.00 and shall continue for twenty-four (24) months thereafter. Producer may extend the Option term for an additional twelve (12) months by paying to Author $50,000. Producer shall have the right to further extend the Option term for up to an additional consecutive six (6) months solely to accommodate the availability of a star, director or theater. The foregoing Option extension payment shall be due prior to the expiration of the initial Option period. The initial Option period or then-current extension period (as applicable) will be extended by the number of days of performances of any workshop, regional theater or other developmental production ("**Developmental Production**") that occurs during such period, plus sixty (60) days. The initial Option period and any extensions thereof as set forth above shall be referred to herein collectively as the "**Option Period**".

The initial Option payment shall be non-returnable, and shall be recoupable from Author's royalties. The Option extension payment shall be nonreturnable, and shall be recoupable from half of Author's royalties after recoupment.

4. Exercise of Option. The initial commercial first class production of the Play presented on Broadway or in the West End of London under Producer's original agreement with the Playwright (the "**Playwright Agreement**") shall be referred to herein as the "**Initial Production**". The Option will be deemed exercised if the first paid public performance of the Initial Production is presented within the Option Period. Producer shall have the right to present a pre-Broadway or pre-West End developmental production, either at a not-for-profit theater or as a commercial engagement.

5. Royalties.

(b) On a company-by-company basis, with respect to each production of the Play that is presented by or under license from Producer prior to the expiration of Producer's production rights under the Playwright Agreement in the applicable territory (each, a "**Production**") and for which royalties are based on gross weekly box office receipts, less customary deductions ("**GWBOR**"), or Company Share (as customarily defined), Author shall be entitled to receive a royalty equal to an amount not less than two-thirds (2/3) of 6% of GWBOR or company share, increasing to 12% upon 110% of recoupment (as customarily defined in the theatrical industry). Any requirement hereunder that Author receive no less than a certain share of any amounts (*e.g.*, royalties, Subsidiary Rights revenues) payable to the Playwright shall be understood to apply to the amounts payable to the original Playwright, it being understood that in the event Producer subsequently engages any additional or replacement writer and is required to pay amounts to such party in excess of (*i.e.*, not deducted from) the amounts payable to the original Playwright, Author shall not be entitled to its minimum share of such excess. Furthermore, in no event will Author be entitled to share in, or receive additional compensation as a result of, any compensation payable to the Playwright for services rendered by such party in connection with the Play in a capacity other than as an author of the Play, provided that such compensation is not designed to reduce Author's compensation hereunder.

(c) Notwithstanding the foregoing, with respect to any Developmental Production from which Playwright is entitled to receive a royalty, Author's royalty shall be paid out of, and not in addition to, Author's royalty, and Author shall receive not less than two-thirds (2/3) of the Playwright's royalty from such Developmental Production, it being understood and agreed that Author shall not be entitled to receive a royalty from any Developmental Production from which Playwright is not entitled to receive a royalty.

(d)     Notwithstanding anything to the contrary contained in this Paragraph 5, Author agrees that if Playwright agrees to any alternative royalty calculation (including royalties based on weekly operating profits) and/or any adjustment, deferral, waiver, amortization and/or reduction of percentage royalties and/or minimum weekly guarantees with respect to any Production, Author shall in good faith also consider agreeing to such calculation, adjustment, deferral, waiver, amortization or reduction with respect to Author's royalties under this Paragraph 4 on the same proportionate basis and to the same extent. For the avoidance of doubt, Author shall not receive both a royalty and a share of Subsidiary Rights revenues from the same production of the Play.

6.     Subsidiary Rights.  Author shall be entitled to two-thirds (2/3) of 100% of the Playwright's Net Compensation from the sale or other disposition of Subsidiary Rights (as customarily defined) in and to the Play. For purposes hereof, "**Playwright's Net Compensation**" shall be defined as all gross receipts actually received by Playwright from the sale or other disposition of all Subsidiary Rights in and to the Play, less customary commissions payable to a stock and/or amateur licensing agent or any other agent or representative (not to exceed 10% of such gross receipts in the aggregate, except with regard to amateur licenses, for which such commissions shall not exceed 20% of such gross receipts in the aggregate), any participations therein payable to Producer (which shall be as set forth in the Minimum Basic Production Contract, or the Approved Production Contract, of the Dramatists Guild), and any share that Author grants to a director and/or choreographer of the Play, Actors Equity, a theater that presents a Developmental Production or any other third party.

7.     Net Profits.  In addition to the royalty set forth above, Producer shall pay (or cause to be paid) to Author 2.5% of 100% of the net profits of the company ("Original Company") which finances and presents the Initial Production. "Net profits" shall be computed, defined and paid in the same manner as for investors in the Original Company.

8.     Merger.  If Producer presents at least twenty-one (21) paid public performances (including an official press opening but not including previews) of the Play on Broadway or the West End of London, then the Novel and the Play shall "merge" (as such term is customarily understood in the live stage theatrical industry) and the rights granted by Author under this agreement shall become exclusively granted to Producer and Playwright (as their respective interests may appear) for a period of seven (7) years after there has been a hiatus of 90 days in which no productions of the Play have been presented in the United States and Canada or the United Kingdom under the auspices of Producer (the "Exclusive Period"), and thereafter on a non-exclusive basis for the duration of the original and all renewal and extended terms of all copyrights in the Novel. Producer hereby agrees that, in the event merger occurs as set forth in this paragraph 6, Producer shall be deemed to have assigned to Playwright all rights in the Novel granted to Producer hereunder, subject, however, to Producer's production and/or other rights in and to the Play as set forth in this agreement and in Producer's agreement with the Playwright. Producer agrees that the rights granted to Producer under this agreement will terminate unless merger occurs within 12 months from the exercise of the Option.

9.     Holdback.  Except as provided below, commencing with the date of this Agreement and continuing the earliest of (i) the termination of the Agency for failure to have obtained the written approval of the Author to a Playwright during the term of the Agency, (ii) Producer's failure to exercise the Option prior to the expiration thereof or failure to achieve merger as set forth above prior to the expiration of Producer's production rights hereunder, and (iii) if the Option is timely exercised and merger occurs, for the duration of the Exclusive Period, Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof (subject to Paragraph 2(b) above).

10.    Billing.  Author will receive billing credit wherever and whenever Playwright is afforded billing credit, except for radio, television, mobile and internet banner and pop-up advertising, vehicular advertising and print advertisements of one-quarter page or less (unless any party receives billing credit in such excluded advertising other than Playwright, director, producers, stars and theater), and subject to customary exclusions for award and congratulatory ads, use of critics' quotes and the customary right to use a billing box or movie-style run-on billing. Such credit will appear immediately following Author's credit, in a type size no less than 100% of the

size of Playwright's credit, in substantially the following form: "Based on the novel 'To Kill a Mockingbird' written by Harper Lee". All other billing terms not expressly provided herein shall be in Producer's sole discretion.

11. Representations, Warranties and Indemnities.

(e) Author hereby represents and warrants that: (i) Author has not assigned or licensed to any person and/or entity, and has not entered into any agreements to place any lien or encumbrance upon, the rights in the Novel that would derogate from or conflict with the rights granted hereunder (subject to the provisions of Paragraph 2(b) above); (ii) there are no claims, litigation or other proceedings pending or threatened which could in any way conflict with the rights granted hereunder; (iii) the Novel, except to the extent that it is based upon or taken from material in the public domain, is wholly original with Author; (iv) Author has the sole and full right and authority to enter into this Agreement and to grant the rights granted hereunder; and (v) there are no third parties from whom any clearances, releases, consents and/or permissions may be necessary for Producer to obtain to exploit any rights to the Work granted hereunder, and the exercise of such rights will not violate any personal, contractual, proprietary or other rights of any third party.

(f) Author agrees to indemnify and hold harmless Producer and Playwright, and their respective affiliates, officers, directors, employees, agents, successors, assignees, licensees and any other parties claiming by or through Producer and/or Playwright, from and against any and all third party claims (including any amounts paid in settlement, subject to the indemnitor's prior written consent, not to be unreasonably withheld), liability, demands, suits, losses, costs, expenses (including reasonable attorneys' fees and disbursements), damages, judgments or recoveries (collectively, "**Claims**") which may be made against or suffered or incurred by Producer, Playwright and such others arising out of or in connection with any breach of any representations, warranties or agreements made by Author hereunder

(g) Producer shall indemnify and hold harmless Author (or require in writing any assignee(s) and/or licensee(s) of Producer's rights hereunder to indemnify and hold harmless Author), from and against any and all Claims which may be made against or suffered or incurred by Author arising out of or in connection with the development, production and exploitation of the Play and which do not arise from or in connection with a breach of Author's representations, warranties or agreements contained herein.

12. Approvals. Author shall have the absolute and unconditional right to approve the Playwright for the Play. Such right of approval of Author hereunder shall be a right of prior, written approval, and Author's exercise of such right shall be within her sole and unfettered discretion.. Author shall also have the right to review the script of the Play and to make comments which shall be considered in good faith by the Playwright, and the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters. If the Author believes that the Play does so derogate or depart, or alter characters, Producer will be given notice thereof as soon as possible, and will be afforded an opportunity to discuss with Owner resolutions of any such concerns.

13. Breach. Anything herein to the contrary notwithstanding, in the event of any default in the payment of any sum of money or other default by Producer or Playwright, as their respective interests may appear, under this Agreement, if Author has provided reasonable notice of such default and a reasonable opportunity to cure such default, Author shall be entitled to an award of reasonable legal fees incurred in the enforcement of her rights hereunder in addition to her remedies at law and in equity.

14. House Seats; Travel. For the official press opening performance of each of the initial Broadway and West End Productions, Author shall be entitled to receive two (2) complimentary tickets to such performance along with accompanying complimentary passes to any opening night party. If such performance occurs more than 100 miles from the current residence of either Author or her designees who will use such tickets, Producer will provide each such person with (i) one (1) business class roundtrip airfare, (ii) ground transportation to and from airports, (iii) first class hotel accommodations for 2 nights, and (iv) a per diem of $125.

15. <u>Long-Form Agreement</u>. The parties hereto intend to enter into a long-form agreement containing the foregoing terms at such time as the parties so elect, which agreement will also contain all other terms and conditions customarily included in agreements of this nature, subject to good faith negotiations.

16. <u>Miscellaneous</u>. All matters concerning this Agreement and its validity, performance or breach shall be governed by the law of the State of New York applicable to contracts made and performed entirely therein. This Agreement may be executed in several counterparts, all of which when signed shall constitute a single agreement. Facsimile and PDF copies of this Agreement and signatures thereon shall be valid and binding on the parties.

Please confirm your agreement to the foregoing by signing your name where indicated below.

Very truly yours,

RUDINPLAY, INC.

By: _____
An Authorized Officer

ACCEPTED AND AGREED:

By: _____
HARPER LEE

NY1301454.6_076169-10002                    5