# EXHIBIT  H

Jonathan Zavin (JZ-1846)
Jonathan Neil Strauss (JS-1090)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK

-------------------------------------------------------X

RUDINPLAY, INC.,                                       :

               Plaintiff,                                :

      -against-                                   :     Civil Action No.

THE ESTATE OF NELLE HARPER LEE and :       **COMPLAINT**
TONJA B. CARTER,
                             :

          Defendants.                                :

                             :

-------------------------------------------------------X

     Plaintiff Rudinplay, Inc. ("Rudinplay"), by and through its undersigned attorneys,  Loeb

& Loeb LLP, as and for its Complaint alleges as follows:

## NATURE OF THE ACTION

     1.     By this action, Rudinplay seeks to protect its rights in, and ensure the public's

access to and enjoyment of, an extraordinary creative work—a theatrical adaptation of Harper

Lee's acclaimed novel *To Kill a Mockingbird* (the "Novel"), written by the renowned, Academy

Award winning writer, Aaron Sorkin.

     2.     Prior to her death, Harper Lee entered into an agreement with Rudinplay (the

"Agreement"), whereby she granted Rudinplay an option to acquire worldwide stage rights in the

Novel.  Ms. Lee specifically approved Mr. Sorkin to serve as the playwright, and the play is

scheduled to premiere, on Broadway, in December, 2018.

3.     Unfortunately, Ms. Lee passed away in February, 2016.  Following Ms. Lee's death, defendant Tonja B. Carter, a lawyer in Ms. Lee's late sister's law firm, has purported to act as the Personal Representative of Ms. Lee's estate.  Even before Ms. Lee's death, Ms. Carter had proven to be a contentious figure, involving Ms. Lee in numerous legal disputes and playing a leading role in the controversial publication of *Go Set a Watchman*—a novel, written by Ms. Lee, that Ms. Carter claimed to discover shortly after Ms. Lee's sister (who had previously handled Ms. Lee's affairs) passed away.

4.     In August, 2017, Rudinplay sent a draft script of the play to Ms. Lee's literary agent in London.  Rudinplay did not receive substantive comments until approximately six months later, when Ms. Carter alleged that the script departed from the spirit of the Novel and altered its characters, ostensibly in violation of the Agreement.  By this time, Rudinplay had already incurred significant expenses in bringing the play to fruition, including casting the play, entering into contracts with the cast members and a general management company, and reserving a theater on Broadway—for the anticipated December, 2018 premiere.

5.     Almost immediately thereafter, in March 2018, Ms. Carter filed a lawsuit against Rudinplay in the United States District Court for the Southern District of Alabama, even though Rudinplay has no contacts with Alabama, and had not dealt directly with anyone in Alabama in negotiating or executing the Agreement.  Rather, Rudinplay had dealt exclusively with Ms. Lee's representatives in New York and London.  Rudinplay has filed a motion to dismiss the Alabama action for lack of personal jurisdiction or, in the alternative, to transfer that action to this Court.

6.     Ms. Carter's conduct, in falsely alleging that the script for the play violates the Agreement, has rendered it impossible for the play to premiere as scheduled in December, 2018, and unless this dispute is resolved in the immediate future, the play will be canceled.  Indeed, upon information and belief, such a result is precisely what Ms. Carter hopes to achieve, as she

wishes for the play to be canceled for ulterior purposes—including to avoid potential liabilities on the part of Ms. Lee's estate resulting from a dispute with third parties concerning ownership of the live stage rights that Ms. Lee had assigned to Rudinplay.

7. Accordingly, by this action, Rudinplay seeks an expedited determination that the play does not, and will not, violate the Agreement in any way, so that Rudinplay will not be deprived of the valuable rights that it contracted and paid for, and the public will not be deprived of an opportunity to view and enjoy this extraordinary creative work. Rudinplay also seeks damages resulting from Ms. Carter's breaches of the Agreement, ostensibly on behalf of Ms. Lee's estate, as well as breaches of the covenant of good faith and fair dealing implied in all agreements.

8. Because the "Play" is defined in the Agreement as the "live stage" adaptation of the Novel, and not merely the script therefore, resolution of Rudinplay's declaratory judgment action will require the Court to view the Play itself, and not simply read the script. In order to facilitate a speedy resolution, Rudinplay is willing to arrange for an immediate performance of the Play, by its full cast, for the Court's benefit in this Courthouse. Upon seeing the Play, it will be apparent that the Play does not impermissibly depart from the spirit of the Novel or alter its characters in any way, and that Ms. Carter's claims to the contrary are wholly without merit.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

10. This Court has personal jurisdiction over the defendants because the claims asserted in this Complaint arise out of and relate to defendants' contacts with the State of New York, and defendants purposefully availed themselves of the privilege of conducting activities

within this State, thus invoking the benefits and protections of this State's laws. Among other things, Nelle Harper Lee (the predecessor-in-interest of defendant the Estate of Nelle Harper Lee) entered into an agreement with Rudinplay (a New York corporation), which was negotiated largely in New York by Ms. Lee's representatives in New York, is governed by New York law, and concerns a theatrical production intended to be presented in New York. Defendant Tonja B. Carter has purported to act as the Personal Representative of the Estate of Nelle Harper Lee and is thus bound by its forum-related contacts, and has also individually engaged in extensive forum-related contacts, including participating in meetings in New York and directing communications to New York that are at the heart of the present dispute. The only meeting between Ms. Carter and Scott Rudin, Rudinplay's principal, took place in New York, New York.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district and a substantial part of the property that is the subject of this action is situated in this district.

## THE PARTIES

12.     Plaintiff Rudinplay is a New York corporation with its principal place of business in New York, New York. Rudinplay is a theatrical production company, which is wholly-owned by its President, the producer Scott Rudin.

13.     Nelle Harper Lee ("Harper Lee" or "Ms. Lee") was a resident of Monroe County, Alabama until her death on or around February 19, 2016.

14.     Upon information and belief, defendant Tonja B. Carter is a citizen of Monroe County, Alabama. Ms. Carter purports to be the Personal Representative of the Estate of Nelle Harper Lee (the "Estate").

## FACTUAL ALLEGATIONS

### Harper Lee and Rudinplay Enter into the Agreement, By Which Rudinplay Acquires an Option to Adapt the Novel into a Live Stage Play

15.    Effective as of June 29, 2015, Rudinplay and Harper Lee entered into an agreement (the "Agreement," a copy of which is annexed as Exhibit A hereto) by which Rudinplay acquired certain rights to adapt the Novel into a live stage play.

16.    The Agreement provided that Rudinplay would have a twelve-month period in which to procure a playwright to create a dramatic adaptation of the Novel for presentation as a live stage play (the "Play"). The Agreement provided that the choice of the playwright would be subject to Ms. Lee's written approval, "in her sole and absolutely unfettered discretion." This absolute approval right over the selection of the playwright for the Play was provided to give Ms. Lee comfort that the writer chosen was of sufficient talent and stature to do justice to her work.

17.    Upon receipt of Ms. Lee's written approval of the playwright, the Agreement provided that Rudinplay would obtain the sole and exclusive option (the "Option") to acquire, on an exclusive (with only a minor exception for stock and amateur rights for an old pre-existing play), worldwide basis, all live stage rights in and to the Novel, and all subsidiary and ancillary rights related to such live stage rights, in consideration for which Rudinplay would pay to Ms. Lee the sum of $100,000.

18.    The Agreement provided that Rudinplay's Option would commence upon payment of the $100,000 and continue for twenty-four (24) months thereafter. The Agreement further provided that Rudinplay could extend the Option term for an additional twelve (12) months by paying Ms. Lee an additional $50,000, and contained additional terms for further extensions relating to, *inter alia*, the availability of a star, director or theater, and the performances of developmental productions.

19.     The Agreement provides that Rudinplay's Option will be deemed exercised upon the presentation of an initial first class production of the Play on Broadway or the West End of London (the "Initial Production"), within the Option period.  If no such Initial Production is presented within the applicable Option period, Rudinplay's Option will be deemed terminated.

20.     In addition, paragraph 12 of the Agreement also provides that the final Play "shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters." Notably, the Agreement defines the term "Play" as the "live stage play" based on the Novel, and not merely the script therefore.  Thus, it is the live Play itself, not the script, that may not derogate or depart from the spirit of the Novel, or alter its characters.

21.     In sharp contrast to Ms. Lee's absolute approval right over the choice of playwright, the Agreement does not grant her (now, her Estate) any approval right over the script for the Play, or any right to subjectively determine whether the Play "derogates or departs" from the spirit of the Novel, or alters its characters.  Rather, the Agreement provides only that the Estate has "the right to review the script of the Play and to make comments which shall be considered in good faith" by the playwright.  The Agreement further provides that, if the Estate nevertheless believes that the Play does so derogate or depart from the spirit of the Novel, or alter its characters, it must "give[] notice [to Rudinplay] as soon as possible …."  The Agreement further provides that, after receiving such notice, Rudinplay shall "be afforded an opportunity to discuss … resolutions of any such concerns."

22.     The requirement that Ms. Lee (now, the Estate) give immediate notice of any dispute was in recognition of the fact that Rudinplay would incur significant expenses in creating the Play, and, if there was truly a *bona fide* dispute concerning whether the Play adhered sufficiently to the Novel, it should be raised before expenses were incurred unnecessarily.

**Harper Lee Approves Aaron Sorkin as Playwright, and Accepts Payments Totaling $150,000 in Consideration for Rudinplay's Option**

23.    Rudinplay successfully procured Aaron Sorkin, one of the leading theater, film and television writers in America, as the playwright for the Play.  Mr. Sorkin is a winner of the Academy Award, a Golden Globe Award, a Broadcast Film Critics Association Award, the Writers Guild Award, and a BAFTA Award for his screenplay for *The Social Network*.  Mr. Sorkin's other films include *Molly's Game* (for which he received an Academy Award, BAFTA Award and Golden Globes nominations), *Steve Jobs* (for which he won a Golden Globe Award, and received a BAFTA Award nomination), *Moneyball* (for which he received an Academy Award, BAFTA Award and Golden Globes nominations), *The American President* (for which he was nominated for a Golden Globe Award nomination), and the screen adaptation of his play, *A Few Good Men* (for which he received a Golden Globe Award nomination).  In addition to the long-running television series "The West Wing," for which he won four Emmy Awards, a Golden Globe Award, two Humanitas Prizes, and a Writers Guild Award, Mr. Sorkin also created the series "Sports Night" and "Studio 60 on the Sunset Strip," and "The Newsroom." Mr. Sorkin's previous plays include "A Few Good Men" and "The Farnsworth Invention."

24.    Ms. Lee, acting through her London-based literary agent Andrew Nurnberg, and exercising the absolute discretion provided to her under the Agreement, approved Mr. Sorkin as playwright.

25.    The approval of Mr. Sorkin as playwright, among other things, reflected the parties' understanding that the Play, while remaining true to the spirit of the Novel, would not be a mere recitation of the Novel from the stage of the theater.  Mr. Sorkin is one of the leading writers in America with a well-established and unique voice, and his participation as playwright

would hardly be necessary, or appropriate, if the Play were to be a mere transcription of the Novel.

26.     Following Ms. Lee's approval of Mr. Sorkin as playwright, Rudinplay sent a check, payable to Ms. Lee in the amount of $100,000, to Mr. Nurnberg, in London, on November 10, 2015.  Pursuant to paragraph 3(a) of the Agreement, the initial term of the Option commenced upon payment of the $100,000, and continued for twenty-four (24) months thereafter, *i.e.*, until November 10, 2017.

27.     Subsequently, on September 11, 2017, Rudinplay wired an additional $50,000 to Mr. Nurnberg in London, thus extending the Option period for an additional twelve (12) months.

28.     Pursuant to the Agreement, the Option period was subject to further extensions relating to, *inter alia*, the availability of a star, director or theater, and the performances of developmental productions.  The Play is currently scheduled to premiere on Broadway on December 13, 2018, within the Option period, and has a star, a director, and a theater confirmed.

**Following Harper Lee's Death, Ms. Carter Purports to Act as the Personal Representative of the Estate**

29.     Harper Lee passed away on February 19, 2016.  Following Ms. Lee's death, defendant Tonja B. Carter has acted as the Personal Representative of Ms. Lee's Estate.

30.     Ms. Carter, an attorney in the law firm formerly run by Harper Lee's older sister, Alice Lee, had proven to be a controversial figure even before Harper Lee's death.  Alice Lee passed away in November, 2014.  Three months later, it was announced that Ms. Carter had discovered Harper Lee's unpublished manuscript *Go Set a Watchman*.  The controversy surrounding the publication of *Go Set a Watchman*, and Ms. Carter's ostensible role in discovering it, has been well documented:

- "The announcement of the rediscovered 'Watchman' manuscript touched off a debate over Harper Lee's capacity to consent to its publication.… Exactly

when and how Ms. Carter discovered the manuscript remains unclear." Jennifer Maloney and Laura Stevens, *Harper's Lee's Lawyer Expands Role; Tonja Carter is locked in a conflict between Ms. Lee and a museum that fosters her legacy*, WALL STREET JOURNAL, July 9, 2015.

- "The controversy surrounding 'Watchman' divided Ms. Lee's hometown, pitting some of her longtime friends and acquaintances, who doubted she had approved of the publication, against Ms. Lee's lawyer, agent and publisher, generating the kind of public spectacle Ms. Lee abhorred…. Ms. Carter emerged as a polarizing figure in the debate. She was at first credited with recovering Ms. Lee's long lost novel, and recounted how she discovered the manuscript for 'Watchman' in a safe deposit box in the summer of 2014. But others disputed that account and said Ms. Carter had been present when the manuscript was discovered in October 2011 during an appraisal by a rare books expert." Serge F. Kovaleski and Alexandra Alter, *Harper Lee's Will, Unsealed, Only Adds More Mystery to Her Life*, THE N.Y. TIMES, March 2, 2018.

- "Controversy has raged since it emerged last month that Lee's lawyer, local attorney Tonja Carter, declared that she had stumbled upon an unpublished manuscript of the novelist's that was a forerunner to Mockingbird and, with the author's agreement, it will be published as a book this summer by HarperCollins. The announcement of Lee's new book earlier this year immediately sparked questions about whether she had given fully informed consent to the publication and was capable of making an independent decision about it …." Joanna Walters, *Harper Lee subject of elder abuse investigation in Alabama, Officials interviewed the 88-year old author of To Kill a Mockingbird in February, before talking to an old friend and neighbor, about her welfare*, THE GUARDIAN, March 12, 2015.

- "The manuscript was presumed lost, according to reports, but was controversially found in 2014 in a safety deposit box by her lawyer, Tonja B. Carter, alongside the original Mockingbird manuscript…. Some friends said that after the death of Alice, a lawyer who handled Lee's affairs, Carter had manipulated Lee to approve publication." Joel Christie, *To Kill a Mockingbird author Harper Lee passes away peacefully at the age of 89*, MAILONLINE, February 19, 2016.

- "Harper Lee's lawyer, who negotiated the deal over this week's controversial launch of Go Set a Watchman, was allegedly far more intricately involved in searching for the manuscript years ago than previously disclosed, the Guardian has been told. According to the allegations, Tonja Carter instigated a meeting at least four years ago in which the author's personal safe deposit box was opened and its contents itemized. The new account appears to conflict with Carter's own version of events, in which the lawyer insisted the manuscript for Lee's second novel was only found in that same deposit box last August." Ed Pilkington, *The lawyer, the lock box and the lost novel: Harper Lee book mystery widens; New account from literary agent appears to*

*conflict with lawyer Tonja Carter's version of the events that led to the discovery of Go Set a Watchman manuscript*, THE GUARDIAN, July 15, 2015.

31.     Among other things, the publication of *Go Set a Watchman* was controversial due to its depiction of Atticus Finch, *To Kill a Mockingbird*'s noble, heroic attorney, as a racist and member of the White Citizens Council (part of a network of white supremacist organizations in the Southern United States in the 1950s, founded primarily to oppose racial integration of schools).

32.     Ms. Carter has been the subject of other controversies as well.  In 2014, the author Marja Mills, who had moved next door to Harper Lee and her sister Alice Lee in 2004, published her book "The Mockingbird Next Door:  Life with Harper Lee."  Ms. Lee issued a statement, through Ms. Carter, saying that the book was not authorized.  In response, Ms. Mills produced a handwritten apology letter from Alice Lee who said Ms. Carter had created the statement and had Ms. Lee sign it.

33.     Ms. Carter was also involved in a controversial decisions on the part of Ms. Lee to sue a local museum in Monroeville that had sold *To Kill a Mockingbird*-related items, and to seize control of a local stage production of *To Kill a Mockingbird* that had previously been performed in a local courthouse.

34.     After Ms. Lee's death, Ms. Carter, purporting to act in her capacity as the person named as the Personal Representative in Ms. Lee's will (the "Will") moved the Probate Court of Monroe County, Alabama to seal Ms. Lee's probate proceeding.  Ms. Lee's probate file, including her Will, was sealed immediately upon the filing of Ms. Carter's motion on February 29, 2016, and remained sealed until February 27, 2018 when, following litigation with The New York Times Company concerning the propriety of the sealing order, the sealing order was vacated.

35.     Following the lifting of the sealing order, the Will (a copy of which is annexed as Exhibit B hereto) became publicly available for the first time.  The Will is dated February 11, 2016, just eight days before Ms. Lee's death.

36.     The Will directs that the bulk of Ms. Lee's assets, including her literary properties, be transferred to a trust, the "2011 Mockingbird Trust."  The Will also purports to appoint Carter as "personal representative," and states that the "personal representative" "may rely and take action upon the advice of the Literary Agent, if one exists, of the 2011 Mockingbird Trust," with respect to the Estate's literary properties.

37.     The will does not disclose the identity of the "Literary Agent" upon whom Carter is instructed to rely, although the literary agent with whom Rudinplay has been dealing on behalf of the Estate, from the inception of the negotiation of the contract to the present, is Andrew Nurnberg, in London, UK.

38.     The 2011 Mockingbird Trust documents have not been publicly disclosed, nor have the beneficiaries of the Trust.

**The Estate Receives a Copy of the Play in August 2017, But Does Not Assert its Purported Objections Until Approximately Six Months Later**

39.     Throughout 2016 and 2017, Mr. Sorkin drafted the script for the Play.  On August 24, 2017, Mr. Rudin sent a draft of the script to Mr. Nurnberg, Ms. Lee's literary agent in London with whom Mr. Rudin and his representatives had dealt extensively in negotiating and executing the Agreement.

40.     On or around September 25, 2017, Mr. Rudin had a brief telephone conversation with Ms. Carter, during which Ms. Carter made a minor comment concerning the script regarding what she perceived to be "passive aggression" between the characters of Atticus and Calpurnia.

41.     Following his conversation with Ms. Carter, on September 28, 2017, Mr. Rudin received an email from Mr. Nurnberg, in which Mr. Nurnberg stated that "I had Tonja [Carter] on the phone, and she was really delighted by her conversation with you.  We are all agreed that the Atticus in the play must remain the Atticus of the book."

42.     In his September 28, 2017 email, Mr. Nurnberg also conveyed that the Atticus of the Play must remain true to the younger Atticus of *To Kill a Mockingbird*, and not progress to the older Atticus of *Go Set a Watchman*.  Beyond that Mr. Nurnberg offered no substantive comments.

43.     On September 29, 2017, Mr. Rudin wrote back to Mr. Nurnberg.  In his email, Mr. Rudin observed that while there would necessarily be some differences between the Play and the Novel owing to the different mediums, the Play would certainly remain true to the Novel's ethos, or spirit:

> We're not looking to make any wholesale changes from what Nelle did but simply to dramatize the book, which is sometimes very passive and more ruminative than dramatic.  We must always have forward motion happening in the narrative, and while some of that might be slightly different than the book, it is not ever intended to change anything about the ethos of the book.  We may want to draw events or relationships slightly differently than Nelle did because we have to have drama occurring (whereas the book does not), and because it is conflict that makes for drama—but I do not think any of what we're doing would ever make anybody who loves the book feel remotely like they were not getting the book onstage.

44.     Following these communications, Rudinplay continued to incur expenses in preparation for the Play's premiere.  Among other things, Rudinplay has reserved a theater on Broadway, for a December, 2018 premiere; has cast the Play (with the esteemed actor Jeff Daniels set to play Atticus Finch) and has entered into contracts with cast members; has retained a director, Bartlett Sher, the resident director of Lincoln Center Theater (and a Tony Award

winner, and seven-time nominee); has scheduled numerous workshops, and has contracted with a general management company for the production.

45.     On or around February 13, 2018, Mr. Rudin sent an updated draft script to Mr. Nurnberg and Ms. Carter, which contained some revisions (including to address the minor comments raised by Ms. Carter during the September 2017 telephone conversation), but was, in all material respects, substantively similar to the version that Mr. Rudin had previously sent on August 24, 2017.  As with the earlier draft, the character of Atticus in the draft script remained noble and idealistic, and true to the character as he appeared in *To Kill a Mockingbird*, and did not in any way progress to or resemble the older, racist Atticus of *Go Set a Watchman*.

46.     On February 16, 2018, Mr. Rudin met with Ms. Carter and Mr. Nurnberg in New York, New York (the only in-person meeting between Mr. Rudin and Ms. Carter).  During that meeting, Ms. Carter raised purported "objections" to the Play that neither she nor Mr. Nurnberg had ever previously asserted.

47.     On March 5, 2017—over six and a half months after receiving a substantially complete draft of the Play's script—Ms. Carter sent a letter to Mr. Rudin (the "March 5 Letter") in which she purported to raise, for the first time, a litany of additional objections to the script.

48.     Among other things, the March 5 Letter asserted that the script for the Play "altered" the characters of Atticus Finch, Calpurnia, Tom Robinson, Jem Finch and Scout Finch, and somehow "derogated or departed" from the spirit of the Novel in several ways.

49.     In ostensible support of these claims, Ms. Carter purported to critique and comment on numerous individual lines of dialogue and minor plot points.  For example, in support of her claim that the Novel "altered" the character of Atticus Finch, Carter asserted, *inter alia*, that "Atticus would never have used a fancy legal term like 'ex parte communication' in talking to Bob Ewell;" "Atticus would not have said that it would be witness tampering to talk to

a witness in a criminal case;" and "Atticus would not have used throwaway lines like, 'You guys have no shortage of catchy slogans,' and 'Then you'll be my man if I ever set out to sea.'"

50.     The Agreement did not give Ms. Lee approval rights over the script of the Play, much less did it give her a right to purport to edit individual lines of dialogue.  It certainly did not give such rights to Ms. Carter, who is not an author, editor, literary agent or critic, and has no known expertise whatsoever in theater or writing.

51.     Upon information and belief, in her dealings with Rudinplay, including in sending the March 5 Letter, Ms. Carter has not been relying upon or taking action in accordance with the advice of the Literary Agent of the 2011 Mockingbird Trust, as required by Ms. Lee's Will.  Nor does Rudinplay have any information that Ms. Carter has consulted with the beneficiaries of the trust who would benefit from the production of the Play.

52.     Rudinplay's attorney responded to the March 5 Letter on March 9, 2018 (the "March 9 Letter").  Among other things, in his response, Rudinplay's attorney noted that Rudinplay did not believe that the then-current draft of the script of the Play either derogated or departed from the spirit of the Novel or altered its characters, but that Rudinplay was "eager to discuss the issues raised … and to have a dialogue about these issues"—as Rudinplay was entitled under the Agreement.

53.     The March 9 Letter also observed that there was limited time to make changes to the script, as the final workshops for the Play were fast approaching, a director had already been retained, a theater had been reserved for the Play to open in December 2018, and the Play had been cast and the company contracted.  The letter also noted that the limited time to make changes to the script had been exacerbated by the fact that virtually the same script had been sent to the Estate more than six months prior, and the Estate and its representatives had previously offered far more modest and limited comments.

**The Estate Refuses to Meet with Rudinplay to Resolve the Purported Dispute, and Instead Files Suit Against Rudinplay in Alabama Federal Court**

54.     Ms. Carter did not respond to the March 9 Letter, or agree to meet with Rudinplay to discuss resolution of the Estate's purported concerns (as the Estate is required to do under the Agreement).

55.     Instead, just four days later, on March 13, 2018, Ms. Carter, purportedly acting in her capacity as Personal Representative of the Estate, filed a Complaint against Rudinplay (the "Initial Complaint") in the United States District Court for the Southern District of Alabama (the "Alabama Action").

56.     In its Initial Complaint in the Alabama Action, the Estate sought a declaration that the Play violates the Agreement because it purportedly:  (i) derogates or departs from the spirit of the Novel in connection with its depiction of the legal proceedings against Tom Robinson; (ii) derogates or departs from the spirit of the Novel in connection with its depiction of a small Alabama town in the 1930s; (iii) derogates or departs from the spirit of the Novel in connection with other matters identified in the March 5 Letter; (iv) alters the character of Atticus Finch; (v) alters the character of Calpurnia; (vi) alters the character of Tom Robinson; (vii) alters the character of Jem Finch; and (viii) alters the character of Scout Finch.

57.     Just a few weeks later, on April 6, 2018, Carter filed an amended complaint in the Alabama Action (the "Amended Alabama Complaint"), which withdraws numerous of the Initial Complaint's claimed bases for declaratory relief.  The Amended Alabama Complaint seeks a declaration that the Play violates the Agreement because it purportedly (i) derogates or departs from the spirit of the Novel in connection with its depiction of the legal proceedings against Tom Robinson, and (ii) alters the characters of Atticus Finch and Jem Finch.

58.     The Estate has apparently abandoned Ms. Carter's previously asserted claims that the Play derogates or departs from the spirit of the Novel in any other respect, or alters any characters other than Atticus and Jem.

59.     On April 9, 2018, the next business day after receiving the Amended Alabama Complaint, Rudinplay moved to dismiss the Alabama Action for lack of personal jurisdiction over Rudinplay pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404.

60.     As explained in greater detail in Rudinplay's motion to dismiss the Alabama Action, there is no basis for the assertion of personal jurisdiction over Rudinplay in Alabama, and the law is clear that the mere act of entering into a contract with an Alabama resident is not sufficient to subject a defendant to personal jurisdiction in that forum.  Rudinplay has no contacts with Alabama, did not set foot in Alabama or deal directly with anyone in Alabama in negotiating or executing the Agreement at issue, and did not take any action by which it purposefully availed itself of the privilege of conducting activities within Alabama.  To the contrary, in negotiating and executing the Agreement, Rudinplay dealt exclusively with Ms. Lee's representatives in New York and London, the Agreement is governed by New York (not Alabama) law, and the performance of the Agreement has occurred almost entirely in New York.

**Carter's False and Improperly-Motivated Claims Are Preventing Rudinplay from Exercising its Option, and Are Causing Irreparable Harm**

61.     Rudinplay's motion to dismiss the Alabama Action has not yet been decided. However, Rudinplay is compelled to immediately file this action because it is suffering, and will continue to suffer, irreparable harm in the absence of expedited discovery and an expedited determination of its declaratory judgment claims.

62.     Pursuant to the Agreement, in order to exercise its Option to acquire live stage rights in and to the Novel, Rudinplay must present the Initial Production of the Play, either on Broadway or in the West End of London, within a specified time frame.

63.     In order for the Play to premiere as scheduled in December 2018, Rudinplay will need to raise millions of dollars in additional capitalization.  However, the existence of the present dispute has rendered it impossible to raise the necessary capitalization, as investors are not willing to invest millions of dollars when a cloud exists over Rudinplay's rights.

64.     If the present dispute is not resolved in the immediate future, Rudinplay will not be able to raise the necessary capitalization, the cast will be released from its commitments, and the reservation of the theater and the Initial Production will be canceled.

65.     Upon information and belief, Ms. Carter's purported objections to the Play's script of the Play are a pretense, designed to force cancellation of the Play and to cause Rudinplay's Option to expire before it can be exercised.

66.     Upon information and belief, among other reasons, Ms. Carter seeks to compel the cancellation of the Play because the Estate has been involved in a dispute with a third party or parties (the heirs of or the Estate of Gregory Peck), concerning ownership of the live stage rights that Ms. Lee assigned to Rudinplay pursuant to the Agreement.  Ms. Carter wishes the Play to be canceled so that the Estate may avoid potential liability to such third party or parties, and/or potential indemnification obligations to Rudinplay.

67.     Rudinplay will suffer irreparable harm if it is prevented from exercising its Option to acquire the live stage rights in and to the Novel by staging the Initial Production.  In addition to the immeasurable damage to Rudinplay's reputation in the theater community that will result from cancellation of the Play, monetary damages resulting from this lost opportunity will be difficult, if not impossible, to quantify.

68.     The Agreement requires that the live stage Play itself (and not the script therefore) may not derogate or depart from the spirit of the Novel or alter its characters.  Accordingly, determination of whether or not the Play impermissibly departs or derogates from the spirit of the Novel, or alters its characters, will require the Court to actually view the Play, rather than merely read its script.  Among other things, determining whether the character of Atticus appearing in the Play is true to the Atticus of the Novel will require the Court to observe Jeff Daniels' portrayal of this iconic character.

69.     In order to facilitate expedited resolution of its declaratory judgment claims, Rudinplay is willing to arrange for an immediate performance of the Play, by as much of its full Broadway cast as is possible, for the Court's benefit in this Courthouse.  Upon seeing the Play, it will be apparent that the Play does not impermissibly depart from the spirit of the Novel or alter its characters in any way, and that Ms. Carter's claims to the contrary are without merit.

## AS AND FOR A FIRST CAUSE OF ACTION
Declaratory Judgment – The Play Does Not Derogate or Depart from the
Spirit of the Novel, or Alter its Characters (Against the Estate)

70.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 69 of the Complaint as if fully stated herein.

71.     Paragraph 12 of the Agreement provides, *inter alia*, that the Play shall not derogate or depart in any manner from the spirit of the Novel or alter its characters.

72.     Ms. Carter, purporting to act on behalf of the Estate, has commenced the Alabama Action, seeking a declaration that the Play derogates or departs from the spirit of the Novel and alters characters.

73.     Ms. Carter's allegations have resulted in irreparable harm to Rudinplay.

74.     By reason of the foregoing, there presently exists a real and actual controversy concerning whether the Play derogates or departs from the spirit of the Novel or alters its

characters in violation of the Agreement, and Rudinplay seeks and is entitled to a declaration that the Play does not so derogate or depart from the spirit of the Novel or impermissibly alter its characters.

75.     In order to avoid further irreparable injury, Rudinplay is entitled to expedited discovery and expedited resolution of its claim for declaratory judgment pursuant to Rules 42(b) and 57 of the Federal Rules of Civil Procedure.

## AS AND FOR A SECOND CAUSE OF ACTION
Declaratory Judgment – Ms. Carter Lacks Authority to Assert Purported Objections
to the Play on Behalf of the Estate (Against Ms. Carter and the Estate)

76.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 75 of the Complaint as if fully stated herein.

77.     Ms. Lee's Will, which purported to appoint Ms. Carter as "personal representative," is dated February 11, 2016, just eight days before Ms. Lee's death.

78.     Upon information and belief, the purported appointment of Ms. Carter as personal representative of the Will is invalid and ineffective.

79.     The Will directs that Ms. Carter rely and take action upon the advice of the Literary Agent of the 2011 Mockingbird Trust with respect to the Estate's literary properties.

80.     Upon information and belief, Ms. Carter has not been relying or taking action upon the advice of the Literary Agent of the 2011 Mockingbird Trust in connection with its dealings with Rudinplay.

81.     The 2011 Mockingbird Trust documents have not been publicly disclosed. Rudinplay does not have any information that indicates that Ms. Carter has consulted with Trustees of the Trust, or the beneficiaries of the Trust who would benefit from the production of the Play, regarding the commencement or continuation of the Alabama Action.

82.     Ms. Carter, purporting to act on behalf of the Estate, has commenced the Alabama Action, seeking a declaration that the Play derogates or departs from the spirit of the Novel and alters characters.

83.     Ms. Carter's allegations have resulted in irreparable harm to Rudinplay.

84.     By reason of the foregoing, there presently exists a real and actual controversy concerning whether Ms. Carter has authority to assert purported objections to the Play on behalf of the Estate, and Rudinplay seeks and is entitled to a declaration that Ms. Carter lacks such authority.

85.     In order to avoid further irreparable injury, Rudinplay is entitled to expedited discovery (including but not limited to expedited discovery concerning the 2011 Mockingbird Trust documents, the identity of the Literary Agent of the 2011 Mockingbird Trust, and the circumstances behind the execution of Ms. Lee's Will) and expedited resolution of its claim for declaratory judgment pursuant to Rules 42(b) and 57 of the Federal Rules of Civil Procedure.

## AS AND FOR A THIRD CAUSE OF ACTION
Breach of Contract Against the Estate

86.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 85 of the Complaint as if fully stated herein.

87.     Paragraph 12 of the Agreement requires that, if Ms. Lee (now, her Estate) believes that the Play derogates or departs from the spirit of the Novel, or alters its characters, the Estate must notify Rudinplay as soon as possible, and must afford Rudinplay an opportunity to discuss resolution of any purported concerns.

88.     The Estate has breached these provisions by, *inter alia*, waiting approximately six months after receiving a substantially complete draft of the Play's script to identify its purported objections (during which time Rudinplay continued to incur significant expenses in connection

with the Play's creation), and then failing and refusing to discuss resolution of its purported concerns with Rudinplay prior to commencing the Alabama Action.

89.     As a result of the foregoing Rudinplay has been damaged in an amount to be proved at trial, but in no event less than $10 million, as well as interest thereon.

## AS AND FOR A FOURTH CAUSE OF ACTION
Breach of Contract Against the Estate for Breach of the Covenant of Good Faith and Fair Dealing

90.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 89 of the Complaint as if fully stated herein.

91.     By its conduct, and without any basis for, and for impermissible reasons, the Estate is preventing Rudinplay from exercising its Option and staging the Initial Production.

92.     By its conduct, and without any basis for, and for impermissible reasons, the Estate is preventing Rudinplay from receiving the benefits that it contracted and paid for pursuant to the parties' Agreement.

93.     As a result of the foregoing, Rudinplay has been damaged in an amount to be proved at trial, but in no event less than $10 million, as well as interest thereon.

## DEMAND FOR JURY TRIAL

Rudinplay hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Rudinplay requests that this Court enter judgment in its favor and against Ms. Carter and the Estate as follows:

A.      Declaring that the Play does not derogate or depart from the spirit of the Novel or alter its characters in a manner that violates the Agreement;

B.      Declaring that Ms. Carter lacks authority to purport to act on behalf of the Estate in alleging that the Play so derogates or departs, or alters characters;

C.      Ordering that the parties' engage in expedited discovery in connection with Rudinplay's declaratory judgment claims, and that resolution of such claims be scheduled for expedited determination in accordance with Rules 42(b) and 57 of the Federal Rules of Civil Procedure;

D.      Awarding Rudinplay damages on its breach of contract and breach of the covenant of good faith and fair dealing claims, in an amount to be proved at trial but in no event less than $10 million, together with interest thereon;

E.      Awarding Rudinplay its costs and attorneys' fees; and

F.      Granting Rudinplay such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
       April 16, 2018

LOEB & LOEB LLP


By:    /s Jonathan Strauss
       Jonathan Zavin (JZ-1846)
       Jonathan Neil Strauss (JS-1090)
       345 Park Avenue
       New York, New York 10154-1895
       (212) 407-4000


       *Attorneys for Plaintiff*

# EXHIBIT A

**RUDINPLAY, INC.**
120 West 45th Street, 10th Floor
New York, New York 10036

As of 29 June, 2015

Ms. Harper Lee
c/o Andrew Nurnberg Associates International
20-23 Greville Street, London EC 1N 8SS
United Kingdom;

Re:     "To Kill a Mockingbird" Live Stage Rights

Dear Ms. Lee:

This letter agreement ("**Agreement**") sets forth the material deal terms that have been agreed upon between Rudinplay, Inc. ("**Producer**") and you ("**Author**") in connection with the live stage and ancillary rights in and to the novel entitled "To Kill a Mockingbird" written by you (the "**Novel**").

1.      Agency.

Commencing with the date of this Agreement and continuing for a period of twelve months thereafter, Author designates Producer as her sole and exclusive agent (the "Agency") to procure a playwright (the "Playwright") to create a dramatic adaptation of the Novel for presentation as a live stage play (the "Play"). The choice of the Playwright shall be subject to the written approval of Author in her sole and absolutely unfettered discretion. Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof during the term of the Agency. In the event the Producer fails to procure a Playwright acceptable to the Author during the term of the Agency, then upon the expiration of the Term the Agency shall terminate absolutely without further notice. For the avoidance of any doubt, the written approval of the Playwright by the Author is a condition precedent to any grant of rights to the Producer in the Novel pursuant to this agreement.

2.      Grant of Rights.

(a)      Upon having obtained the written approval of the Author to the Playwright, Author shall thereby grant to Producer and its licensees and assignees the sole and exclusive option (the "**Option**") to acquire, on an exclusive (subject to Paragraph 2 (b) below), worldwide basis, all live stage rights in and to the Novel and all subsidiary and ancillary rights related to such live stage rights, including without limitation: (i) the right to create, develop, produce and present a live stage play (the "**Play**") based on and using the Work and any and all elements thereof (including without limitation the right to present the Play in first and non-first class touring and sit-down productions), (ii) the right to use the title "To Kill a Mockingbird" in connection with the Play, and (iii) the right to exploit all customary advertising rights in all media, merchandising rights and stock and amateur licensing rights (subject to Paragraph 1(b) below). It shall be a condition precedent to the approval of the Playwright that the Playwright shall agree in writing that any grant of stock and amateur licensing rights is to be contingent on: (i) an annual professional performance of the Play in Monroeville, AL, (ii) a prohibition against any license for performance of the Play by or under the auspices of the Monroe County Museum or to any successor or affiliated entity, organization or individual, and (iii) a restriction against any license for performance of the Play within sixty (60) miles of the city limits of Monroeville, AL.

(b)      Producer acknowledges that pursuant to an agreement (the "**Prior Agreement**") dated June 26, 1969 between Author and The Dramatic Publishing company ("**DPC**"), Author granted DPC the right to create a play (the "**Prior Adaptation**") based on the Novel, and to exploit the amateur acting rights (as defined in the

Prior Agreement) in the Prior Adaptation. Author represents that it has terminated the Prior Agreement effective April 26, 2016. Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

3.    Option Periods and Payments.

(a)    In consideration for Author's grant of the Option, Producer shall pay to Author the sum of $100,000, payable upon the Author's written approval of the Playwright. The initial term of the Option shall commence upon payment of the $100,000.00 and shall continue for twenty-four (24) months thereafter. Producer may extend the Option term for an additional twelve (12) months by paying to Author $50,000. Producer shall have the right to further extend the Option term for up to an additional consecutive six (6) months solely to accommodate the availability of a star, director or theater. The foregoing Option extension payment shall be due prior to the expiration of the initial Option period. The initial Option period or then-current extension period (as applicable) will be extended by the number of days of performances of any workshop, regional theater or other developmental production ("**Developmental Production**") that occurs during such period, plus sixty (60) days. The initial Option period and any extensions thereof as set forth above shall be referred to herein collectively as the "**Option Period**".

The initial Option payment shall be non-returnable, and shall be recoupable from Author's royalties. The Option extension payment shall be nonreturnable, and shall be recoupable from half of Author's royalties after recoupment

4.    Exercise of Option. The initial commercial first class production of the Play presented on Broadway or in the West End of London under Producer's original agreement with the Playwright (the "**Playwright Agreement**") shall be referred to herein as the "**Initial Production**". The Option will be deemed exercised if the first paid public performance of the Initial Production is presented within the Option Period. Producer shall have the right to present a pre-Broadway or pre-West End developmental production, either at a not-for-profit theater or as a commercial engagement.

5.    Royalties.

(b)    On a company-by-company basis, with respect to each production of the Play that is presented by or under license from Producer prior to the expiration of Producer's production rights under the Playwright Agreement in the applicable territory (each, a "**Production**") and for which royalties are based on gross weekly box office receipts, less customary deductions ("**GWBOR**"), or Company Share (as customarily defined), Author shall be entitled to receive a royalty equal to an amount not less than two-thirds (2/3) of 6% of GWBOR or company share, increasing to 12% upon 110% of recoupment (as customarily defined in the theatrical industry). Any requirement hereunder that Author receive no less than a certain share of any amounts (e.g., royalties, Subsidiary Rights revenues) payable to the Playwright shall be understood to apply to the amounts payable to the original Playwright, it being understood that in the event Producer subsequently engages any additional or replacement writer and is required to pay amounts to such party in excess of (i.e., not deducted from) the amounts payable to the original Playwright, Author shall not be entitled to its minimum share of such excess. Furthermore, in no event will Author be entitled to share in, or receive additional compensation as a result of, any compensation payable to the Playwright for services rendered by such party in connection with the Play in a capacity other than as an author of the Play, provided that such compensation is not designed to reduce Author's compensation hereunder.

(c)    Notwithstanding the foregoing, with respect to any Developmental Production from which Playwright is entitled to receive a royalty, Author's royalty shall be paid out of, and not in addition to, Author's royalty, and Author shall receive not less than two-thirds (2/3) of the Playwright's royalty from such Developmental Production, it being understood and agreed that Author shall not be entitled to receive a royalty from any Developmental Production from which Playwright is not entitled to receive a royalty.

(d)     Notwithstanding anything to the contrary contained in this Paragraph 5, Author agrees that if Playwright agrees to any alternative royalty calculation (including royalties based on weekly operating profits) and/or any adjustment, deferral, waiver, amortization and/or reduction of percentage royalties and/or minimum weekly guarantees with respect to any Production, Author shall in good faith also consider agreeing to such calculation, adjustment, deferral, waiver, amortization or reduction with respect to Author's royalties under this Paragraph 4 on the same proportionate basis and to the same extent.  For the avoidance of doubt, Author shall not receive both a royalty and a share of Subsidiary Rights revenues from the same production of the Play.

6.     <u>Subsidiary Rights</u>.  Author shall be entitled to two-thirds (2/3) of 100% of the Playwright's Net Compensation from the sale or other disposition of Subsidiary Rights (as customarily defined) in and to the Play.  For purposes hereof, **"Playwright's Net Compensation"** shall be defined as all gross receipts actually received by Playwright from the sale or other disposition of all Subsidiary Rights in and to the Play, less customary commissions payable to a stock and/or amateur licensing agent or any other agent or representative (not to exceed 10% of such gross receipts in the aggregate, except with regard to amateur licenses, for which such commissions shall not exceed 20% of such gross receipts in the aggregate), any participations therein payable to Producer (which shall be as set forth in the Minimum Basic Production Contract, or the Approved Production Contract, of the Dramatists Guild), and any share that Author grants to a director and/or choreographer of the Play, Actors Equity, a theater that presents a Developmental Production or any other third party.

7.     <u>Net Profits</u>.  In addition to the royalty set forth above, Producer shall pay (or cause to be paid) to Author 2.5% of 100% of the net profits of the company ("Original Company") which finances and presents the Initial Production. "Net profits" shall be computed, defined and paid in the same manner as for investors in the Original Company.

8.     <u>Merger</u>.  If Producer presents at least twenty-one (21) paid public performances (including an official press opening but not including previews) of the Play on Broadway or the West End of London, then the Novel and  the Play shall "merge" (as such term is customarily understood in the live stage theatrical industry)  and the rights granted by Author under this agreement shall become exclusively granted to Producer and Playwright (as their respective interests may appear) for a period of seven (7) years after there has been a hiatus of 90 days in which no productions of the Play have been presented in the United States and Canada or the United Kingdom under the auspices of Producer (the "Exclusive Period"), and thereafter on a non-exclusive basis for the duration of the original and all renewal and extended terms of all copyrights in the Novel.  Producer hereby agrees that, in the event merger occurs as set forth in this paragraph 6, Producer shall be deemed to have assigned to Playwright all rights in the Novel granted to Producer hereunder, subject, however, to Producer's production and/or other rights in and to the Play as set forth in this agreement and in Producer's agreement with the Playwright.  Producer  agrees that the rights granted to Producer under this agreement will terminate unless merger occurs within 12 months from the exercise of the Option.

9.     <u>Holdback</u>.  Except as provided below, commencing with the date of this Agreement and continuing the earliest of (i) the termination of the Agency for failure to have obtained the written approval of the Author to a Playwright during the term of the Agency, (ii) Producer's failure to exercise the Option prior to the expiration thereof or failure to achieve merger as set forth above prior to the expiration of Producer's production rights hereunder, and (iii) if the Option is timely exercised and merger occurs, for the duration of the Exclusive Period, Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof (subject to Paragraph 2(b) above).

10.     <u>Billing</u>.  Author will receive billing credit wherever and whenever Playwright is afforded billing credit, except for radio, television, mobile and internet banner and pop-up advertising, vehicular advertising and print advertisements of one-quarter page or less (unless any party receives billing credit in such excluded advertising other than Playwright, director, producers, stars and theater), and subject to customary exclusions for award and congratulatory ads, use of critics' quotes and the customary right to use a billing box or movie-style run-on billing.  Such credit will appear immediately following Author's credit, in a type size no less than 100% of the

size of Playwright's credit, in substantially the following form: "Based on the novel 'To Kill a Mockingbird' written by Harper Lee". All other billing terms not expressly provided herein shall be in Producer's sole discretion.

11.     Representations, Warranties and Indemnities.

(e)     Author hereby represents and warrants that: (i) Author has not assigned or licensed to any person and/or entity, and has not entered into any agreements to place any lien or encumbrance upon, the rights in the Novel that would derogate from or conflict with the rights granted hereunder (subject to the provisions of Paragraph 2(b) above); (ii) there are no claims, litigation or other proceedings pending or threatened which could in any way conflict with the rights granted hereunder; (iii) the Novel, except to the extent that it is based upon or taken from material in the public domain, is wholly original with Author; (iv) Author has the sole and full right and authority to enter into this Agreement and to grant the rights granted hereunder; and (v) there are no third parties from whom any clearances, releases, consents and/or permissions may be necessary for Producer to obtain to exploit any rights to the Work granted hereunder, and the exercise of such rights will not violate any personal, contractual, proprietary or other rights of any third party.

(f)     Author agrees to indemnify and hold harmless Producer and Playwright, and their respective affiliates, officers, directors, employees, agents, successors, assignees, licensees and any other parties claiming by or through Producer and/or Playwright, from and against any and all third party claims (including any amounts paid in settlement, subject to the indemnitor's prior written consent, not to be unreasonably withheld), liability, demands, suits, losses, costs, expenses (including reasonable attorneys' fees and disbursements), damages, judgments or recoveries (collectively, "**Claims**") which may be made against or suffered or incurred by Producer, Playwright and such others arising out of or in connection with any breach of any representations, warranties or agreements made by Author hereunder

(g)     Producer shall indemnify and hold harmless Author (or require in writing any assignee(s) and/or licensee(s) of Producer's rights hereunder to indemnify and hold harmless Author), from and against any and all Claims which may be made against or suffered or incurred by Author arising out of or in connection with the development, production and exploitation of the Play and which do not arise from or in connection with a breach of Author's representations, warranties or agreements contained herein.

12.     Approvals.  Author shall have the absolute and unconditional right to approve the Playwright for the Play.  Such right of approval of Author hereunder shall be a right of prior, written approval, and Author's exercise of such right shall be within her sole and unfettered discretion..  Author shall also have the right to review the script of the Play and to make comments which shall be considered in good faith by the Playwright, and the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters.  If the Author believes that the Play does so derogate or depart, or alter characters, Producer will be given notice thereof as soon as possible, and will be afforded an opportunity to discuss with Owner resolutions of any such concerns.

13.     Breach.  Anything herein to the contrary notwithstanding, in the event of any default in the payment of any sum of money or other default by Producer or Playwright, as their respective interests may appear, under this Agreement, if Author has provided reasonable notice of such default and a reasonable opportunity to cure such default, Author shall be entitled to an award of reasonable legal fees incurred in the enforcement of her rights hereunder in addition to her remedies at law and in equity.

14.     House Seats; Travel.  For the official press opening performance of each of the initial Broadway and West End Productions, Author shall be entitled to receive two (2) complimentary tickets to such performance along with accompanying complimentary passes to any opening night party.  If such performance occurs more than 100 miles from the current residence of either Author or her designees who will use such tickets, Producer will provide each such person  with (i) one (1) business class roundtrip airfare, (ii) ground transportation to and from airports, (iii) first class hotel accommodations for 2 nights, and (iv) a per diem of $125.

15.   Long-Form Agreement.  The parties hereto intend to enter into a long-form agreement containing the foregoing terms at such time as the parties so elect, which agreement will also contain all other terms and conditions customarily included in agreements of this nature, subject to good faith negotiations.

16.   Miscellaneous.  All matters concerning this Agreement and its validity, performance or breach shall be governed by the law of the State of New York applicable to contracts made and performed entirely therein.  This Agreement may be executed in several counterparts, all of which when signed shall constitute a single agreement.  Facsimile and PDF copies of this Agreement and signatures thereon shall be valid and binding on the parties.

Please confirm your agreement to the foregoing by signing your name where indicated below.

Very truly yours,

RUDINPLAY, INC.

By:_____
    An Authorized Officer

ACCEPTED AND AGREED:

By:_____
    HARPER LEE

# EXHIBIT B

IN THE MATTER OF       )          **PROBATE COURT**
THE ESTATE OF         )     **MONROE COUNTY, ALABAMA**
NELLE HARPER LEE,     )
DECEASED             )        CASE NO. 3572

### PETITION OF TONJA B. CARTER
### FOR THE PROBATE OF THE WILL OF
### NELLE HARPER LEE, DECEASED,
### AND FOR THE ISSUANCE OF
### LETTERS TESTAMENTARY WITHOUT BOND

TO THE HONORABLE GREG NORRIS, JUDGE OF PROBATE, MONROE COUNTY, ALABAMA:

       Comes now your petitioner, the undersigned Tonja B. Carter, and respectfully represents unto this Honorable Court as follows:

       1.     Nelle Harper Lee (the "Decedent"), who at the time of her death was an inhabitant of Monroe County, Alabama, died in Monroeville, Alabama on February 19, 2016, leaving assets in the State of Alabama and in the County of Monroe, and leaving a will dated February 11, 2016 (the "Will"), duly signed by the Decedent and attested by Paul B. Fields and Cynthia McMillan, witnesses. The Will was made self-proved by acknowledgment by the testator and affidavits of the witnesses, each made before a notary public as evidenced by said notary public's certificate, under official seal, pursuant to Section 43-8-132 of the Code of Alabama (1975), as amended. The Decedent was over eighteen years of age when she executed the Will.

       2.     Your petitioner delivers the Will to, and files the Will with, this Court and prays that, after proper proceedings and proofs, it may be probated and admitted to record as the Will of the Decedent.

       3.     In Section 5.1 of Article 5 of the Will, the Decedent appointed Tonja B. Carter (your petitioner), as the personal representative of the Will.

       4.     Section 8.3 of Article 8 of the Will contains an express provision exempting your petitioner from giving any bond, or filing any inventory with this Court, as personal representative of the Will. Your petitioner is over nineteen years of age and is in no respect disqualified under the law from serving as personal representative of the Will.

1

1/3944755.1

5. The addresses of the aforesaid witnesses to the Will are:

Paul B. Fields
3815 Interstate Court
Montgomery, AL 36109

Cynthia McMillan
459 Burson Road
Frisco City, AL 36445

6. The names, relationships and present addresses of the heirs and next of kin of the Decedent are as follows:

Herschel Henry Conner III, nephew
5153 SW 103rd Way
Gainesville, FL 32608

Edwin Lee Conner, nephew
627 Taylor Avenue
Frankfort, KY 40601

Mary McCall Lee, niece
106 Asheton Lane
Auburn, AL 36830

Edwin Coleman Lee, Jr., nephew
39 Lynda Lane
Monroeville, AL 36460

All of the above named next of kin are nineteen years of age or older, and all are of sound mind.

Your petitioner therefore prays that this Honorable Court will take jurisdiction of this petition, that said Will be probated and admitted to record as the true Will of the Decedent and that this Honorable Court will cause all such notices or citations to issue to the Decedent's heirs at law and next of kin (whether to be served by personal service or by publication or by other lawful means) as may be proper in the premises and cause all such proceedings to be had and done and such proof to be taken and render all necessary orders and decrees in the premises as will duly and legally effect the probate and record in this Honorable Court of the Will of the Decedent. Your petitioner also prays that this Honorable Court will grant letters testamentary to her as personal representative of the Will, without entering into bond, as is provided in and by the terms of the Will, and that all such orders and decisions be made by this Honorable Court as it may deem necessary and proper.

2

1/3944755.1

FILED - 02/29/2016 05:10:03 PM
GREG NORRIS, Judge of Probate, Monroe County, AL

_Tonja B. Carter_
Tonja B. Carter

## VERIFICATION

STATE OF ALABAMA )
: 
COUNTY OF MONROE )

     Before me, a Notary Public in and for said county in said state, personally appeared Tonja B. Carter, who, being by me first duly sworn, makes oath that she has read the foregoing petition and is informed and believes and, upon the basis of such information and belief, avers that the facts alleged therein are true and correct.

_Tonja B. Carter_
Tonja B. Carter

Subscribed and sworn to before me this the 21ˢᵗ day of _February_ , 2016.

_Sir E. Ch_
Notary Public

[NOTARIAL SEAL]

My Commission expires 

SCOTT E. ADAMS
My Commission Expires
November 5, 2018

Attorneys for Petitioner:
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
(205) 521-8000

3

1/3944755.1

FILED – 02/29/2016  05:10:15 PM
GREG NORRIS, Judge of Probate, Monroe County, AL

IN THE MATTER OF )
THE ESTATE OF )
NELLE HARPER LEE, )
DECEASED )

PROBATE COURT
MONROE COUNTY, ALABAMA

CASE NO. 3572

## WAIVER OF NOTICE FOR THE PROBATE
## OF THE WILL OF NELLE HARPER LEE, DECEASED,
## AND CONSENT FOR THE ISSUANCE OF
## LETTERS TESTAMENTARY WITHOUT BOND

I, Herschel Henry Conner III, being over the age of nineteen years, being of sound mind and being a nephew of Nelle Harper Lee, deceased, hereby accept service of notice of the filing of the petition for probate of the will of Nelle Harper Lee, deceased, and for the issuance of letters testamentary without bond; hereby waive all other and further notice thereof, either by publication, personal service or otherwise; and do hereby enter my appearance in Court on the day set for hearing said matter and on any date to which the same may be continued. I hereby consent to and agree that the will of Nelle Harper Lee, deceased, be admitted to probate and that a decree approving the petition to probate the will of Nelle Harper Lee and the appointment of Tonja B. Carter, as personal representative, without bond, be entered by the Court.

Dated this 21 day of FEBRUARY , 2016.

_____
Herschel Henry Conner III

STATE OF ALABAMA )
:
COUNTY OF MONROE )

I, the undersigned, hereby certify that Herschel Henry Conner III, whose name is signed to the foregoing Waiver and Consent, and who is known to me, acknowledged before me on this day that, being informed of the contents of the Waiver and Consent, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal of office this 21ST day of February , 2016.

_____
Notary Public

[NOTARIAL SEAL]                    My Commission exp

SCOTT E. ADAMS
My Commission Expires
November 5, 2018

1/3944756.1

IN THE MATTER OF  )  PROBATE COURT
THE ESTATE OF  )  MONROE COUNTY, ALABAMA
NELLE HARPER LEE,  )
DECEASED  )  CASE NO. 3572

### WAIVER OF NOTICE FOR THE PROBATE
### OF THE WILL OF NELLE HARPER LEE, DECEASED,
### AND CONSENT FOR THE ISSUANCE OF
### LETTERS TESTAMENTARY WITHOUT BOND

I, Edwin Lee Conner, being over the age of nineteen years, being of sound mind and being a nephew of Nelle Harper Lee, deceased, hereby accept service of notice of the filing of the petition for probate of the will of Nelle Harper Lee, deceased, and for the issuance of letters testamentary without bond; hereby waive all other and further notice thereof, either by publication, personal service or otherwise; and do hereby enter my appearance in Court on the day set for hearing said matter and on any date to which the same may be continued. I hereby consent to and agree that the will of Nelle Harper Lee, deceased, be admitted to probate and that a decree approving the petition to probate the will of Nelle Harper Lee and the appointment of Tonja B. Carter, as personal representative, without bond, be entered by the Court.

Dated this 21st day of February, 2016.

_Edwin L. Conner_
Edwin Lee Conner

STATE OF ALABAMA  )
                   :
COUNTY OF MONROE  )

I, the undersigned, hereby certify that Edwin Lee Conner, whose name is signed to the foregoing Waiver and Consent, and who is known to me, acknowledged before me on this day that, being informed of the contents of the Waiver and Consent, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal of office this 21st day of February, 2016.

_Scott E. Adams_
Notary Public

[NOTARIAL SEAL]  My Commission exp

SCOTT E. ADAMS
My Commission Expires
November 5, 2016

FILED : 02/29/2016 05:10:33 PM
GREG NORRIS, Judge of Probate, Monroe County, AL

1/3944756.1

IN THE MATTER OF ) PROBATE COURT
THE ESTATE OF ) MONROE COUNTY, ALABAMA
NELLE HARPER LEE, )
DECEASED ) CASE NO. _3572_

## WAIVER OF NOTICE FOR THE PROBATE
## OF THE WILL OF NELLE HARPER LEE, DECEASED,
## AND CONSENT FOR THE ISSUANCE OF
## <u>LETTERS TESTAMENTARY WITHOUT BOND</u>

      I, Mary McCall Lee, being over the age of nineteen years, being of sound mind and being a niece of Nelle Harper Lee, deceased, hereby accept service of notice of the filing of the petition for probate of the will of Nelle Harper Lee, deceased, and for the issuance of letters testamentary without bond; hereby waive all other and further notice thereof, either by publication, personal service or otherwise; and do hereby enter my appearance in Court on the day set for hearing said matter and on any date to which the same may be continued. I hereby consent to and agree that the will of Nelle Harper Lee, deceased, be admitted to probate and that a decree approving the petition to probate the will of Nelle Harper Lee and the appointment of Tonja B. Carter, as personal representative, without bond, be entered by the Court.

      Dated this _21st_ day of _February_, 2016.

                                _Mary M. Call Lee_
                                   Mary McCall Lee

STATE OF ALABAMA )
                 :
COUNTY OF MONROE )

      I, the undersigned, hereby certify that Mary McCall Lee, whose name is signed to the foregoing Waiver and Consent, and who is known to me, acknowledged before me on this day that, being informed of the contents of the Waiver and Consent, she executed the same voluntarily on the day the same bears date.

      Given under my hand and seal of office this _21st_ day of _February_, 2016.

                                  _Scott E. Adams_
                                  Notary Public

[NOTARIAL SEAL]
                          My Commission expir          SCOTT E. ADAMS
                                          My Commission Expires
                                          November 5, 2018

1/3944756.1

IN THE MATTER OF )          PROBATE COURT
THE ESTATE OF )          MONROE COUNTY, ALABAMA
NELLE HARPER LEE, )
DECEASED )          CASE NO. 3572

### WAIVER OF NOTICE FOR THE PROBATE
### OF THE WILL OF NELLE HARPER LEE, DECEASED,
### AND CONSENT FOR THE ISSUANCE OF
### LETTERS TESTAMENTARY WITHOUT BOND

       I, Edwin Coleman Lee, Jr., being over the age of nineteen years, being of sound mind and being a nephew of Nelle Harper Lee, deceased, hereby accept service of notice of the filing of the petition for probate of the will of Nelle Harper Lee, deceased, and for the issuance of letters testamentary without bond; hereby waive all other and further notice thereof, either by publication, personal service or otherwise; and do hereby enter my appearance in Court on the day set for hearing said matter and on any date to which the same may be continued. I hereby consent to and agree that the will of Nelle Harper Lee, deceased, be admitted to probate and that a decree approving the petition to probate the will of Nelle Harper Lee and the appointment of Tonja B. Carter, as personal representative, without bond, be entered by the Court.

       Dated this 21st day of _February_, 2016.

                               _____
                               Edwin Coleman Lee, Jr.

STATE OF ALABAMA )
                 :
COUNTY OF MONROE )

       I, the undersigned, hereby certify that Edwin Coleman Lee, Jr., whose name is signed to the foregoing Waiver and Consent, and who is known to me, acknowledged before me on this day that, being informed of the contents of the Waiver and Consent, he executed the same voluntarily on the day the same bears date.

       Given under my hand and seal of office this 21st day of _February_, 2016.

                               _____
                               Notary Public

[NOTARIAL SEAL]           My Commission expires

SCOTT E. ADAMS
My Commission Expires
November 5, 2016

1/3944756.1

FILED - 02/29/2016 05:10:49 PM
GREG NORRIS, Judge of Probate, Monroe County, AL

# WILL
## OF
### NELLE HARPER LEE

I, Nelle Harper Lee, domiciled in Monroe County, Alabama, being eighteen years of age or older, hereby make, publish and declare this to be my will and hereby revoke all prior wills and codicils.

## ARTICLE 1
### Probate Estate

In this will, the term "my probate estate" means all property, real and personal and wheresoever situated, that I own at my death or to which I or my estate or any personal representative of mine may be or become entitled, and I intend to dispose of all thereof by this will. However, the term "my probate estate" shall not include (i) any assets which provide for a beneficiary designation (e.g., IRA's and insurance policy proceeds) and name beneficiaries other than my estate or my personal representative, or (ii) any assets that are owned jointly with right of survivorship between me and another person who survives me. Also, I do not by this will exercise any power of appointment of which I may be or become the donee; accordingly, the term "my probate estate" shall not include any property that may be subject to any such power of appointment.

## ARTICLE 2
### Payment of Debts, Administrative Expenses and Taxes

Section 2.1 - I direct my personal representative to pay the following items out of my probate estate: (1) the expenses of my last illness; (2) my funeral and burial expenses, including the costs of any grave marker or tombstone; (3) the expenses of administering my estate, including the reasonable expenses of safekeeping and delivery of estate property; (4) my debts, except such debts of mine secured by pledge, mortgage or other security interest not by their terms due at my death that my personal representative may deem unnecessary or undesirable to pay; and (5) the amounts of all written pledges of mine for religious, charitable, scientific, literary or educational purposes, whether or not the same shall constitute debts, that are current but unpaid at my death, and, accordingly, I give the respective amounts of such pledges, free of any Death Taxes described in this article, to those persons, organizations and entities to whom those pledges shall at my death purport to be payable, and I empower my personal representative to determine what shall constitute a "pledge" and a "religious, charitable, scientific, literary or educational" purpose, and what is "current" as those quoted terms are used in this article.

1

FILED - 03/29/2016 05:11:19 PM
GREG NORRIS, Judge of Probate, Monroe County, AL